1  JOHN M. HAYTOL (SBN 119903)
2  15455 N. Greenway-Hayden Loop C4
   Scottsdale, Arizona 85260
3  (480) 619-4747
   (480) 619-4740 Fax
4  jmhaytol@yahoo.com
   Attorney for Plaintiff GWS Technologies, Inc., formerly
5  First Responder Products, Inc.

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10                      SOUTHERN DIVISION

11  GWS TECHNOLOGIES, INC., a          | Case No. SACV08-00586 CJC (PLAx)
12  Delaware corporation, formerly FIRST |
    RESPONDER PRODUCTS, INC., a        |
13  Delaware corporation,              |
                                       | **FIRST AMENDED COMPLAINT**
14         Plaintiff,                  |
                                       | **1. Disgorgement of Short-Swing
15         vs.                         | Profits in Violation of Securities
                                       | Exchange Act of 1934 § 16(b) (15
16                                     | U.S.C. 78p(b));**
    DOUGLAS G. FURTH, individually and | **2. Intentional or Negligent
17  allegedly dba Millennium Consulting | Misrepresentation-Inducement;**
    Group, Inc., a defunct Ohio corporation; | **3. Concealment of Material Facts-
18  MARK FIXLER; JAG ENTERPRISES,      | Inducement;**
    LLC, an Ohio limited liability company; | **4.Promise without Intent to Perform-
19  MICHEL ATTIAS; BRENDON             | Inducement;**
    ATTIAS; TIMOTHY GARLIN; MARC       | **5.Fraud and Deceit in the Execution;**
20  J. BERNSTEIN; COMPREHENSIVE        | **6. Conspiracy To Defraud;**
    FINANCIAL SERVICES LLC, an Ohio    | **7. Claim and Delivery**
21  limited liability company; THE     |
    SIGNATURE FUND, a purported Ohio   |
22  limited partnership; SIGNATURE     |
    MANAGEMENT, LLC, an Ohio limited   |
23  liability company; LEGENT CLEARING |
24  LLC, a Nebraska company; UBS       |
    FINANCIAL SERVICES, INC., a        |
25  California company; NATIONAL       |
    FINANCIAL SERVICES LLC aka         |
26  FIDELITY INVESTMENTS               |
27  NATIONAL FINANCIAL SERVICES, a     |
    Massachusetts company ; eTRADE     |
28

I/s
S-20
cv-5

                              1
                   FIRST AMENDED COMPLAINT

SECURITIES, a Virginia company and
DOES 1-200,

Defendants.

PLAINTIFF GWS TECHNOLOGIES, INC., (formerly First Responder Products, Inc.) for its First Amended Complaint, alleges as follows:

## JURSIDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "1934 Act"), 28 U.S.C. §§1331 and 1337. The claims asserted herein arise under Section 10(b), 16(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b), 78(n), 78p(b) and 78t(a); and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated by the SEC.

2.    Venue is proper in this District pursuant to Section 22 of the 1933 Act, Section 27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). The Plaintiff has offices in this District, several Defendants are residents of this District, and many of the transactions, acts, practices and harms alleged occurred within this District.

3.    In connection with the wrongs alleged herein, Defendants used the instrumentalities of interstate commerce, including the United States mails, interstate wire and telephone facilities, and the facilities of the national securities markets.

## NATURE OF THE ACTION

4.    This is an action by a publicly-traded company, GWS Technologies, Inc. (formerly First Responder Products, Inc.), to recover short-swing profits illegally obtained by Defendants through improper "short-swing" trading in Plaintiff's stock. Plaintiff also seeks to recover damages for fraud based upon the deceits committed by Defendants in inducing Plaintiff to enter into purported contracts with Defendants, and for damages caused by Defendants' ongoing frauds against Plaintiff. Plaintiff also seeks the return of its improperly-obtained stock now held by several brokerage firms in accounts controlled by Defendants.

**PARTIES TO THE ACTION**

5.    Plaintiff GWS TECHNOLOGIES, INC. (hereafter "the Company" or "GWSI") is a corporation incorporated under the laws of the State of Delaware, with principal places of business in Scottsdale, Arizona and Newport Beach, California.    On June 30, 2008, Plaintiff First Responder Products, Inc. (hereafter "the Company") changed its corporate name to GWS Technologies, Inc.    Prior to March 21, 2008, Eric Johnson ("Johnson") was the Chief Executive Officer of the Company, and Richard Reincke ("Reincke") was the Chief Operating Officer.    From March 21, 2008 to the present, Johnson has acted as the Chairman of the Board of the Company and Reincke has acted as President and Chief Executive Officer of the Company.

6.    Defendant Douglas G. Furth is an individual whom Plaintiff is informed and believes resides in the State of Ohio (hereafter referred to as "Defendant FURTH").

7.    Defendant Mark Fixler is an individual whom Plaintiff is informed and believes resides in the state of Ohio (hereafter referred to as "Defendant FIXLER").

8.    Plaintiff is informed and believes and on that basis alleges that Defendant JAG Enterprises, LLC, (hereafter referred to as "Defendant JAG") is an Ohio limited liability company, owned and operated by Defendant FIXLER.

9.    Defendant Michel Attias is an individual whom Plaintiff is informed and believes resides in the State of California (hereafter referred to as "Defendant ATTIAS").

10. Defendant Brendon Attias is an individual whom Plaintiff is informed and believes resides in the State of California (hereafter referred to as "Defendant Brendon ATTIAS"), and is also the son of Defendant Michel ATTIAS

11.    Defendant Timothy Garlin is an individual whom Plaintiff is informed and believes resides in the State of California (hereafter referred to as "Defendant GARLIN").

12.    Defendant Marc J. Bernstein is an individual whom Plaintiff is informed and believes resides in the state of Ohio (hereafter referred to as "Defendant BERNSTEIN").

13.    Plaintiff is informed and believes that Millennium Consulting Group, Inc.

1  was a corporation owned and operated by Defendant FURTH (sometimes hereafter
2  referred to as "MILLENNIUM"). MILLENNIUM was incorporated in the State of Ohio
3  on July 14, 1998 (Exhibit "1" hereto). On August 16, 2006, MILLENNIUM was notified,
4  through its registered agent for service, that MILLENNIUM's Articles of Incorporation
5  had been cancelled for failure to pay franchise taxes (Exhibit "2" hereto).

6      14.    Plaintiff is informed and believes that COMPREHENSIVE FINANCIAL
7  SERVICES LLC is an Ohio limited liability company with its principal place of business
8  in Cleveland, Ohio.

9      15.    Plaintiff is informed and believes that THE SIGNATURE FUND is a
10  purported Ohio limited partnership with its principal place of business in Solon, Ohio.

11      16.    Plaintiff is informed and believes that SIGNATURE MANAGEMENT, LLC,
12  is an Ohio limited liability company with its principal place of business in Solon, Ohio.

13      17.    Plaintiff is informed and believes that LEGENT CLEARING LLC (hereafter
14  "LEGENT") is a stock brokerage and clearing organization with principal places of
15  business in Omaha, Nebraska and Chicago, Illinois.

16      18.    Plaintiff is informed and believes that UBS FINANCIAL SERVICES, INC.
17  (hereafter "UBS") is a stock brokerage and clearing organization with places of business
18  in every state including California.

19      19.    Plaintiff is informed and believes that NATIONAL FINANCIAL SERVICES
20  LLC. aka FIDELITY INVESTMENTS NATIONAL FINANCIAL SERVICES (hereafter
21  "FIDELITY") is a stock brokerage and clearing organization with its principal place of
22  business in Boston, MA.

23      20.    Plaintiff is informed and believes that eTRADE SECURITIES (hereafter
24  "eTRADE") is a stock brokerage and clearing organization with its principal place of
25  business in Virginia.

26      21.    Defendants FURTH, FIXLER, Michel ATTIAS, Brendon ATTIAS,
27  GARLIN, BERNSTEIN, MILLENNIUM and DOE Defendants 1-100 have referred to

28

FIRST AMENDED COMPLAINT

1   themselves, and are sometimes referred to herein, as the "Group."

2       22.     The true names and capacities of the DOE Defendants named herein are

3   unknown to Plaintiff at this time, as the Group Defendants have taken steps to conceal the

4   identities of the DOE Defendants in order to engage in "wash" trading and other

5   prohibited stock manipulation activities, among others. Plaintiff believes that information

6   obtained in discovery will lead to the identification of each DOE Defendant's true name

7   and capacity, and the extent of each DOE Defendant's participation in the acts alleged

8   herein which form the gravamen of Plaintiff's complaint. Certain DOE Defendants are

9   stockbrokers, brokerage firms, individuals, associates and/or family members of other

10  Defendants, and are therefore collectively members of the "Group."

11

12                          **GENERAL ALLEGATIONS**

13      **The Company**

14

15      23.     First Responder Products, Inc. was a Delaware corporation involved with

16  supplying police, fire, medical and military personnel with unique goods and services.

17  The Company, as of May, 2007, was a publicly-traded company on the Over-The-Counter

18  Bulletin Board ("OTCBB"), an electronic quotation system, under the symbol "FRPD."

19  On June 30, 2008, Plaintiff First Responder Products, Inc. changed its corporate name to

20  GWS Technologies, Inc., symbol "GWSI" (hereafter "the Company").

21      24.     From approximately May 1, 2006 through November 1, 2006 the Company

22  had raised a total of approximately $476,000 from the sale of its common stock through

23  private placements pursuant to the provisions of Section 4(2) of the Securities Act of 1933

24  and Rule 506 of Regulation D. The purchase price for shares of the common stock was

25  $1.00.

26      25.     In December 2006 the Company filed its registration statement with the

27  Securities and Exchange Commission ("SEC"). The SEC approved the Company's

28

registration statement in March, 2007 and by May 2007 the Company's common stock was approved for quotation on the OTCBB.

26. Companies whose stock is quoted on the OTCBB must be fully reporting with the SEC and both the companies and their "control persons" are subject to periodic reporting requirements.

## THE COMPANY IS FRAUDULENTLY INDUCED INTO CONTRACTS

27. In August of 2007, Reincke received an unsolicited telephone call from Defendant GARLIN. Johnson and Reincke knew Defendant GARLIN because from approximately 2002 through 2005 a company Defendant GARLIN owned, TLG Communications, Inc., had provided investor relations services to a prior public company where Johnson and Reincke worked and had been directors.

28. Defendant GARLIN, in that first telephone call, told Reincke that Defendant GARLIN was "working" with "highly reputable" financial providers, affiliated with "institutional investors" who could provide "private placement financing," and that his new partner, Defendant FURTH, was an investment banker who could raise equity financing for the Company if GARLIN could convince him to accept the Company as a "client."

29. Because of the pre-existing relationship with Defendant GARLIN, Johnson and Reincke agreed to talk with Defendant FURTH.

30. Johnson, Reincke, GARLIN and FURTH had a telephone conference call during which Defendant FURTH represented he was an investment banker and that his company, MILLENNIUM, could raise millions of dollars for the Company. However, FURTH told Johnson and Reincke that he needed to be "protected" to make sure the millions of dollars he was going to provide the Company were not "misspent."

31. Between August 16, 2007 and August 25, 2007, Defendant FURTH proposed

a series of contracts which provided that FURTH receive a block of 1,000,000 free-trading shares of the Company's stock and $5,000 per month without any performance requirements. During this time period, the Company rejected all of the contract proposals offered by Defendant FURTH.

32.    On August 25, 2007, Reincke sent Defendant FURTH an email proposing that the Company engage MILLENNIUM for $5,000 per month to assist in various matters relating to corporate financing, and that the Company enter into a separate agreement to retain FURTH, personally, through a "consulting agreement" which would provided FURTH with options to purchase up to 1,000,000 shares of the Company's common stock at $0.75 per share exercise price, which could be exercised through a promissory note that would be forgivable for acceptable performance, as reviewed monthly. (Exhibit "3" hereto.)

33.    Reincke's email stated that this type of structure would allow the Company a mechanism to ensure performance and acquire certain services that would help the Company in its business expansion.

34.    Reincke's August 25, 2007 email further informed FURTH that the proposal would allow the Company to retain FURTH personally for services that did not involve capital raising transactions or market making activities and therefore allow S-8 stock compensation, while paying MILLENNIUM cash compensation for those services which might be related to IR work, capital raising, corporate finance, or market making activities.

35.    In his August 25, 2007 email to FURTH, Reincke stated:

We are all very cognizant of the two primary areas of abuse that are strictly forbidden for S-8 stock issuances. First, companies fraudulently issue S-8 stock to nominal employees or consultants, who then sell the shares at the direction of (and for the benefit of) the issuer. Second, Form S-8 has been misused to register securities issued to compensate advisors who then use the shares to hype and/or

promote the issuer's securities. These two specific misuses have routinely led to SEC investigations and prosecutions by SEC staff . . . We all want to make sure that we comport with the S-8 guidelines. (Exhibit "3" hereto).

36.   From August 28 through September 6 Defendant GARLIN continued to call and tell both Reincke and Johnson that Defendant FURTH could raise the Company millions of dollars, but Defendant FURTH was "afraid" that the Company might "misspend" the money, which according to Defendant GARLIN was coming from Defendant FURTH's and MILLENNIUM's "institutional investors."

37.   After receiving Reincke's August 25, 2007 email, Defendant FURTH rejected the Company's proposal, insisting that the Company sign the agreements proposed by Defendant FURTH as written.

38.   From August 28 through September 5, 2007, Defendant GARLIN was in telephone communication with Johnson and Reincke. Defendant GARLIN told Reincke and Johnson that Defendants GARLIN and FURTH, whom he referred to as his "new partner", were having telephone conversations about the Company in which Defendant GARLIN tried to convince Defendant FURTH that the Company was a legitimate company and that the Company would not spend the funds raised on cars, personal items, etc., but rather on the business. In other words, Defendant GARLIN was vouching for both sides. Defendant GARLIN continued to represent Defendant FURTH as an investment banker.

39.   From September 4 to September 6 Defendant GARLIN represented to Reincke that Defendant GARLIN had personally seen a letter from an institutional investor to Defendants FURTH and MILLENNIUM guaranteeing funding of $3,000,000 to the Company, but that Defendant FURTH and MILLENNIUM would not provide the Company with the money until the Company signed the contracts.

40.   Defendant FURTH gave Reincke several "references" in connection with his purported investment banking and equity financing activities. In or about early September

2007 and prior to Plaintiff's execution of the Agreements, Reincke contacted Defendant BERNSTEIN, referred to Reincke by Defendant FURTH as a personal reference. Defendant BERNSTEIN identified himself as a medical doctor who had met Defendant FURTH at a charity fundraiser for disabled children.

41.    Defendant BERNSTEIN represented to Reincke that Defendant FURTH was a "wealthy, well-respected investment banker in Ohio." Defendant BERNSTEIN said that he eventually became involved in some business dealings with Defendant FURTH (specifically, a "family film company") which, BERNSTEIN represented had been "very successful."

42.    Defendant BERNSTEIN personally vouched for Defendant FURTH, claiming FURTH was scrupulously honest and that FURTH ran an investment fund called The Signature Fund that invested in small public companies.

43.    At that time, Defendant BERNSTEIN did not disclose to Reincke that BERNSTEIN was one of the principals of Defendant THE SIGNATURE FUND, with FURTH the "general partner" and BERNSTEIN the "Senior Vice-President, research" of THE SIGNATURE FUND.  In addition, Defendant FURTH is a "Partner" and Defendant BERNSTEIN is the "Chief Operating Officer" of "Family Screen Partners, LP," a purported Ohio limited partnership.

44.    Defendant BERNSTEIN, by misleading Reincke about FURTH's references, acted and intended to assist FURTH and the Group to induce the Company to enter into agreements with Defendant FURTH and MILLENNIUM.

45.    On or about September 6, 2007, in reliance on the representations of Defendants, the Company signed two separate agreements with Defendant FURTH and MILLENNIUM, respectively, which provided for cash payments and the issuance of 1,000,000 shares of stock to Defendant FURTH. Copies of the purported agreements, a "Consulting Agreement" with FURTH and a "Financing Agreement" with MILLENNIUM are attached hereto as Exhibits "4" and "5" hereto.

46.   However, the Company did not immediately register and issue the stock, and requested confirmation from FURTH that the $3,000,000 funding would be provided to the Company in a timely manner.

47.   On September 18, 2007 Defendant FURTH sent Johnson an email in which he represented $3 million in financing would be provided to the Company within "30-45 days" if the Company issued the 1,000,000 (one million) free-trading shares of the Company stock to Defendant FURTH.   A copy of that email is attached as Exhibit "6" hereto.   The email stated:

> I have an interested party in the financing, in the approximate amount of $3 million. This financing is contingent upon the following set of terms and conditions at this point: restricted stock at the $1.00 level; 10% commission on the monies raised; a PR program being done, necessitating the activation of our 1,000,000 free-trading share payment. As soon as you give me the 'go' signal we can get started. I am advised that the money raise can begin immediately, and that it can be completed in about 30-45 days per the funder . . . I will need from you the thumbs up to this proposal and the appropriate documentation that you have used in the past to raise money, so that we can seek to shortcut the document preparation process . . .

48.   In reliance upon the representations made by Defendants GARLIN and FURTH, that the $3 million financing was in place and would be available within the 30-45 day time frame represented by Defendants, the Company caused to be issued to Defendant FURTH, on September 22, 2007, one million shares of stock in the Company (the stated "activation" of the free trading shares).

49.   The one million shares issued to Defendant FURTH were registered as "S-8" shares, paid as compensation to a consultant.

50.   At the time stock was issued to Defendant FURTH, in an email from Reincke, the Company specifically instructed and informed Defendant FURTH that said stock could not be redistributed or otherwise used to "create a market" or be distributed.

51.    Plaintiff is informed and believes and alleges thereon that Defendant FURTH, upon receiving the one million shares of stock, improperly distributed a large block of that S-8 stock to Defendants FIXLER, Michel ATTIAS ("ATTIAS") and Defendant Brendon ATTIAS, the son of Defendant Michel Attias.

52.    Plaintiff is informed and believes and thereon alleges that Defendants have further improperly distributed the S-8 stock to other DOE Defendants for purposes forbidden by the SEC in furtherance of their scheme to control the market for Plaintiff's stock including, but not limited to, "wash" sales and possible secondary sale offerings.

53.    Plaintiff is informed and believes and thereon alleges that the Group Defendants agreed to act together for the purpose of acquiring, holding, voting or disposing of the equity securities of Plaintiff, and the Group Defendants acquired a beneficial ownership of more than five percent of Plaintiff's common stock, as such beneficial ownership is described in Sections 13(d) and 13(g) of the Securities Exchange Act of 1934 ("Exchange Act").

54.    Exchange Act Section 13(d) [15 U.S.C. § 78m(d)] and Rule 13d-1 [17 C.F.R. § 240.13d-1] require any person who acquires more than five percent of a company's class of stock registered under Exchange Act Section 12 [15 U.S.C. § 78l] to file with the Securities and Exchange Commission a Schedule 13D disclosure. Rule 13d-2 [17 C.F.R. § 240.13d-2] requires such person to timely amend the Schedule 13D if any material changes occur. Defendants FURTH, GARLIN, ATTIAS, FIXLER, Brendon ATTIAS and Does 1 through 100 failed to timely file a SEC Schedule 13D disclosure statement concerning Defendant FURTH's, and thereafter the "Group's" acquisition of 1,000,000 shares of Plaintiff's common stock.

55.    By reason of the foregoing, Defendants violated Exchange Act Section 13(d) [15 U.S.C. § 78m(d)] and Rules 13d-1 [17 C.F.R. § 240.13d-1] and 13d-2 [17 C.F.R. § 240.13d-2].

## DEFENDANTS' CONTINUING ACTS OF FRAUD AND DECEIT

56.    On or about October 9, 2007, FURTH sent an email to Plaintiff directing Plaintiff to "alter your Subscription Documents to read that the raise is for $500,000. When done, please send them out to us immediately so that we can get you some short-term money from our guys." A copy of that email is attached as Exhibit "7" hereto.

57.    On or about October 9, 2007, FIXLER also sent an email to Plaintiff which stated, in pertinent part, "Can you please give us an offering doc with a mini-max offering. The 506 is fine but we would like it to be $100,000.00 min and $500,000 max. This is just to get you some quick capital until the major raise." FIXLER further requested that the amended subscription documents be emailed to ATTIAS. Plaintiff, believing the representations of Defendants that they were raising immediate short-term capital for Plaintiff, provided the amended documents to Defendants as requested. A copy of that email is attached as Exhibit "8" hereto.

58.    On or about October 16, 2007, Johnson and Reincke spoke by telephone with FIXLER about the status of the alleged capital raising activities by Defendants, as Plaintiff had not received any equity financing from Defendants. Based on the repeated representations of financing by Defendants, Plaintiff was induced to enter into contracts with new suppliers (in reliance on the contracts with those suppliers being funded by the promised equity raise); and to enter into contracts to expand Plaintiff's business operations, including but not limited to the hiring of new employees and the leasing of additional business facilities (in reliance on those additional costs being funded by the promised equity raise).

59.    FIXLER again promised and represented that the Group was capable of raising, and would raise, the entire three million dollars ($3,000,000) in equity financing and that the first five hundred thousand dollars ($500,000) would be raised very quickly.

60.    FIXLER and the Group defendants represented and promised that some "short term" financing could be arranged to "bridge" Plaintiff over until the claimed

"significant equity capital" was provided to Plaintiff.

61.    On approximately October 18, 2007 the "Group," through Defendant FIXLER and Defendant JAG, entered into a purported lending transaction with Plaintiff where Plaintiff borrowed a total of $175,000.00 intended by the parties solely as a short term "bridge" loan until the promised "equity capital" was received.

62.    Plaintiff is informed and believes and alleges thereon that the JAG "loan" was in furtherance of the Group Defendants' fraud, to keep Plaintiff operating until Defendants had the opportunity to manipulate Plaintiff's stock through their "pump and dump" scheme.

63.    From approximately October 16, 2007 through November 30, 2007, individual members of the Group had regular telephone communications with Johnson and Reincke regarding the Group's alleged equity capital raising activities. During this period ATTIAS and FIXLER made numerous promises to Johnson and Reincke, which were confirmed by GARLIN, that the Group had raised significant equity capital for Plaintiff and, further, that executed subscription documents and checks in specific amounts, including in the respective amounts of one hundred thousand dollars ($100,000); seventy-five thousand dollars ($75,000) and twenty-five thousand dollars ($25,000) were "in the mail" from Defendants to Plaintiff or being couriered to Plaintiff from Defendants' investors.

64.    All of these representations were false and none of these promises were performed. The true facts were that neither the Group collectively nor ATTIAS, FIXLER, FURTH or GARLIN individually had raised any equity capital for Plaintiff or intended to raise any equity capital for Plaintiff.

65.    During the same period Defendants ATTIAS and FIXLER made numerous statements that Plaintiff's "money problems" would be over on a series of future dates (for example, "By next Wednesday all your money problems will be over") because, according to Defendants, Defendants' investors had signed subscription agreements and

1   Defendants were gathering the signed checks for mailing or couriering to Plaintiff.

2   66.    When none of the promised subscription documents and checks arrived either
3   through the mail or via courier, ATTIAS communicated to Plaintiff, via telephone, a
4   series of detailed stories and excuses regarding the "lost" checks. All of these stories and
5   excuses were false.

6   67.    On or about November 8, 2007, Grant Cowie ("Cowie"), an acquaintance of
7   ATTIAS, and Jeff Krohnfeldt ("Krohnfeldt"), an associate of Cowie, raised fifty thousand
8   dollars ($50,000) from an accredited investor by the private placement of fifty thousand
9   shares of Plaintiff's restricted common stock at a price of one dollar ($1.00) per share.

10   68.    Cowie and Krohnfeldt informed Plaintiff via telephone and in-person
11   meetings that they believed they could raise significant equity capital for Plaintiff.

12   69.    Plaintiff is informed and believes, and alleges thereon that, upon learning of
13   Cowie and Krohnfeldt's successful equity capital raising efforts the "Group," through
14   Defendant ATTIAS, contacted Cowie and Krohnfeldt and instructed them to **stop** raising
15   equity capital for Plaintiff.    Cowie and Krohnfeldt were told by the Group, through
16   Defendant ATTIAS, that the first five hundred thousand dollars ($500,000) had been
17   raised by Defendant ATTIAS and the Group; that this five hundred thousand dollars
18   ($500,000) had been delivered to Plaintiff; and that the Group was contemplating raising
19   the remainder of the three million dollar ($3,000,000) private placement at a price higher
20   than one dollar ($1.00) per share.

21   70.    These representations were false. The true facts were that Defendant
22   ATTIAS and the Group had not raised **any** equity capital for Plaintiff; had not delivered
23   **any** equity capital to Plaintiff; and were not contemplating raising the remainder of the
24   three million dollar ($3,000,000) private placement at a price higher than one dollar
25   ($1.00) per share, or at all.

26   71.    On or about December 5, 2007, Defendant FIXLER told Johnson and
27   Reincke, via telephone, that the Group had "lined up" over a million dollars in an equity

28

investment from an institutional fund which would be provided to Plaintiff after January 1, 2008. FIXLER refused to identify the alleged institutional fund or explain why the investment could not be made until after January 1, 2008.

72.    This representation was false, and this equity investment was never provided to Plaintiff.

73.    On or about December 30, 2007, GARLIN sent an email to FURTH, FIXLER, Johnson and Reincke indicating that GARLIN had spoken with an investor who was interested in an investment in Plaintiff between $250,000 to $500,000. A copy of that email is attached as Exhibit "9" hereto. Despite GARLIN's representations to Reincke that this "investor" wanted to speak over the holiday weekend (to Reincke's surprise) the purported investor was never identified, never spoke with Reincke or any other representative of Plaintiff and never provided any investment.

74.    Despite their numerous promises and factual representations to do so, Defendants did not intend to raise any equity capital for Plaintiff, but instead wanted Plaintiff to become more economically distressed and vulnerable while waiting for equity capital from Defendants that was promised, but not coming. To date, no further equity capital has been raised by Defendants; Defendants have refused to fulfill any of the promises and representations made by them; and when asked about the status of their claimed financing, have resorted to insulting and scabrous email responses to hide their fraud and deceit.

75.    At the time of this filing, the stock improperly controlled by the Group Defendants is being held in Defendants' name, or in accounts controlled by Defendants, at brokerage accounts at LEGENT, UBS, FIDELTY and eTRADE.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CAUSE OF ACTION

### (Disgorgement of Short-Swing Profits in Violation of Securities Exchange Act of 1934 § 16(b) (15 U.S.C. 78p(b))

### (Against Defendants Furth, Fixler, M. Attias, B. Attias, Garlin, Millennium and DOES 1-100)

76.    Plaintiff hereby realleges and incorporates paragraphs 1-26, 45- 55 herein.

77.    Section 16(a) of the Exchange Act, 15 U. S. C. 78p(a), establishes a mechanism for reporting information to notify issuers and security holders of short-swing transactions, thereby facilitating actions for recovery of profits under Section 16(b) of the Exchange Act.

78.    Under Section 16(a), insiders <u>must</u> comply with the disclosure requirements by filing an initial beneficial ownership report, a "Form 3" report, and subsequent change in beneficial ownership reports, or "Form 4" reports, with the Securities and Exchange Commission (17 C.F.R. 240.16a-3(a)).

79.    Disclosure information specified in the Form 3 and Form 4 reports is <u>mandatory</u>, and information disclosed is a matter of public record available for inspection by members of the public.

80.    Insiders must disclose any change in their ownership of securities by filing a Form 4 before the end of the second business day following such change. Those reports are made available to the public and set forth the insider's name, the date of the transaction, the number of shares bought or sold and the price per share.

81.    These requirements exist so that a corporation may quickly determine whether a statutory insider has profited from a short-swing transaction by examining the Form 4s filed with the SEC. The issuer may then use the Form 4s to establish 16(b) liability.

82.    Plaintiff is informed and believes and thereon alleges that, at all times relevant herein, Defendants FURTH, GARLIN, ATTIAS, Brendon ATTIAS, FIXLER

and Does 1 through 100 acted as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of the securities of Plaintiff, such that they became a single owner of Plaintiff's common stock (as specified by Section 13(d)(3) of the Securities Exchange Act of 1934) for purposes of sections 16(a) and 16(b).

83. Defendants therefore directly or indirectly became the beneficial owners of more than ten percent of the common stock of Plaintiff, which is a class of equity security which is registered under Exchange Act Section 12 [15 U.S.C. § 78l]. Defendants were therefore obligated to file timely reports on SEC Forms 3 and 4 disclosing their initial beneficial ownership and any changes in beneficial ownership.

84. Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, failed to make timely disclosures concerning their beneficial ownership of Plaintiff's common stock as required by Exchange Act Section 16(a) [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. §240.16a-3] because at all relevant times Defendants failed and refused to file the relevant SEC Forms 3 and 4.

85. Plaintiff is informed and believes and thereon alleges that these failures to disclose beneficial ownership of Plaintiff's common stock concealed that the Group Defendants, within a period of six months, directly engaged in short-swing trading through their own accounts and had indirectly engaged in short-swing trading through the accounts of certain strawmen which they controlled, including but not limited to Defendant Brendon ATTIAS and DOES 1-100. The Group Defendants' sale of Plaintiff's common stock during the manipulation scheme resulted in their receipt of short-swing trading profits therefrom.

86. As part of Defendants' plan to obtain short-swing profits, Plaintiff is informed and believes and alleges thereon that the "Group" and DOES 1-100 simultaneously bought and sold the Company common stock through various allied accounts controlled by the Group, engaging in "wash" trading to increase activity in the stock and create the false impression that market forces were increasing the price of the

Company stock.

87.    By law, short-swing trading profits under 16(b) inure to the issuer and are gains of the issuer. Both an issuing company and shareholders of an issuing company have a statutory right to sue on behalf of the company to recover short-swing profits.

88.    These failures to disclose the Group's beneficial ownership and stock sales deprived both Plaintiff and Plaintiff's public shareholders of the means to discover short-swing trades and had the effect of denying Plaintiff and its shareholders the right to recover short-swing profits for the benefit of Plaintiff.

89.    Plaintiff is informed and believes and thereon alleges that during a six month period, the Group Defendants, and Does 1-100, purchased and sold the common stock of Plaintiff and realized short-swing profits therefrom, in excess of the jurisdictional amount of this Court.

90.    Before each short-swing transaction, the Group Defendants and Does 1-100 were beneficial owners of 10% of the outstanding common stock of Plaintiff.

91.    By reason of the foregoing, Defendants FURTH, GARLIN, ATTIAS, FIXLER, Brendon ATTIAS and Does 1 through 100 violated Exchange Act Section 16(a) [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. §240.16a-3] thereunder.

92.    By reason of the foregoing, each member of the Group, directly and through various DOE strawmen, violated Section 16(b) of the Securities Exchange Act of 1934.

WHEREFORE, Plaintiff prays for relief as follows:

Disgorgement of all short-swing profits, by all Defendants, in an amount to be determined at time of trial.


## SECOND CAUSE OF ACTION

**(Intentional or Negligent Misrepresentation-Inducement) (Cal. Civ. Code § 1710)**

**(Against Defendants Furth, Garlin, Bernstein, Millennium and Does 1-100)**

93.    Plaintiff hereby realleges and incorporates paragraphs 1 through 92 herein.

94.   Defendants GARLIN and FURTH had worked together previously in inducing a different company into "engaging" FURTH to provide "services" in exchange for stock, with litigious results (the "EGLY lawsuit").

95.   Specifically, in a case with strong parallels to this matter, Defendant FURTH testified in the EGLY suit that Defendant GARLIN induced Ever-Glory International Group, Inc. and one its shareholders, Blue Chip IR Group, Ltd., to enter into contracts with FURTH by which FURTH was to receive 1,000,000 shares of EGLY stock for "financial public relations" services[1]. Blue Chip alleged FURTH used the EGLY shares he had received as compensation to engage in illegal conduct and violate securities laws by artificially manipulating the volume and price for EGLY shares. The relevant letter from Blue Chip's counsel, dated February 17, 2006, is attached as Exhibit "10" hereto.

96.   In the instant matter Defendant GARLIN, as with the EGLY lawsuit, was the person that found the "mark," a company that trusted him.

97.   Defendant GARLIN, in his efforts to induce Plaintiff the Company to enter into contracts with Defendant FURTH and MILLENNIUM, made numerous misrepresentations of material fact he knew were not true, or had no reasonable basis for believing them to be true including, but not limited to, the following:

    a.   Defendant FURTH was an "investment banker;"

    b.   Defendant FURTH was a "highly reputable" financial provider;

    c.   Defendant FURTH was affiliated with "institutional investors;"

    d.   Defendant FURTH had access to "millions of dollars;"

    e.   Defendant FURTH was a "sophisticated financier;"

    f.   Defendant FURTH was a "man of the highest integrity;"

    g.   Defendant FURTH was "afraid" that the Company might "misspend" the

---

[1] The EGLY action was originally filed as <u>Blue Chip IR Group Ltd. v. Furth</u>, Case No. 060903232 in the Utah state courts on February 23, 2006. A temporary restraining order was entered on March 1, 2006. Furth removed the action to the United States District Court for the District of Utah, Case No. 2:06:CV185. The case was transferred to the Northern District of Ohio and consolidated with an action filed the day before, February 22, 2006 by Furth to pre-empt jurisdiction after receiving a letter from Blue Chip's attorney (Case No 1:06CV0411). That case is presently pending.

FIRST AMENDED COMPLAINT

money, which according to Defendant GARLIN was coming from Defendant FURTH's "institutional investors."

h.    Defendant GARLIN had "personally seen" a letter from an institutional investor to Defendant FURTH guaranteeing funding of $3,000,000 to the Company;

i.    Defendant FURTH would "not provide" the Company with the money unless and until the Company signed the contracts with FURTH and with MILLENNIUM.

98.    Each of Defendant GARLIN's representations was false.

99.    Defendant BERNSTEIN, in his efforts to induce Plaintiff the Company to enter into contracts with Defendant FURTH and MILLENNIUM, made numerous misrepresentations of material fact he knew were not true, or had no reasonable basis for believing them to be true including, but not limited to, the following:

a.    Defendant FURTH "was a wealthy, well-respected investment banker in Ohio;"

b.    Defendant FURTH was "scrupulously honest;"

c.    Defendant FURTH ran an investment fund that invested in small public companies.

100.    Each of BERNSTEIN's representations was false.

101.    Defendant FURTH's representation, that $3 million in financing would be provided to the Company within "30-45 days" if the Company issued the 1,000,000 (one million) free-trading shares of the Company stock to Defendant FURTH, was false.

102.    Defendant FURTH's representation, that he was an investment banker who could raise millions of dollars for the Company, was false.

103.    The false representations made by FURTH, GARLIN and BERNSTEIN were intended to have Plaintiff rely on them, to its detriment.

104.    Plaintiff was justified in its reliance on Defendants' misrepresentations.

105.    Based upon the false representations of material fact made by Defendants, Plaintiff was induced to:

a.    Enter into a contract with Defendant FURTH;

b.    Enter into a purported contract with a defunct corporation, MILLENNIUM;

c.    Pay FURTH and GARLIN cash payments, and the Company stock, as advance compensation for services which FURTH and GARLIN had no intention of performing and which MILLENNIUM was legally incapable of performing.

106.    Because of Defendants' conduct, Plaintiff has been damaged in an amount according to proof at trial, but at least in excess of one million dollars ($1,000,000).

107.    Because any and all consideration obtained by Defendants, and each of them, was obtained by deceit, Plaintiff prays for the return of all consideration given to or taken by Defendants including, but not limited to, one million (1,000,000) shares of the Company common stock and payments to FURTH in the amount of $71,000.00.

108.    Defendants, and each of them, acted with oppression, fraud and/or malice, and Plaintiff is thereby entitled to and claims punitive damages, based upon Defendants' actions, pursuant to Cal. Civ. Code §3294, et. seq., in an amount to be determined according to proof.

## THIRD CAUSE OF ACTION

### (Concealment of Material Facts-Inducement) (Cal. Civ. Code § 1710)

### (Against Defendants Furth, Garlin, Bernstein, Millennium and Does 1-100)

109.    Plaintiff hereby realleges and incorporates paragraphs 1 through 108 herein.

110.    Defendant FURTH's representation, that MILLENNIUM was a valid corporation able to enter into a "Financing Agreement" with the Company was false.

111.    Defendant FURTH concealed and/or suppressed the material fact that MILLENNIUM had lost its right to conduct business for failure to pay taxes in Ohio.

112.    Defendant FURTH suppressed and concealed material facts that Defendant FURTH was obligated to disclose, that is, that MILLENNIUM could not legally contract with Plaintiff.

FIRST AMENDED COMPLAINT

113. Defendant FURTH suppressed and concealed material facts by telling Plaintiff other facts to mislead Plaintiff and prevent Plaintiff from discovering the concealed or suppressed facts.

114. Defendant GARLIN suppressed and concealed the material fact that Defendant FURTH, in connection with the similar EGLY consulting "referral" by Defendant GARLIN, had been sued by that client for allegedly using his network of business associates to effect matched trades in EGLY shares for the purpose of manipulating reported volume and price information, which was not contemplated by the client when it entered into the agreement with FURTH. Defendant GARLIN also suppressed and concealed other material facts concerning the alleged actions and misrepresentations by FURTH and GARLIN in that matter.

115. Defendant BERNSTEIN suppressed and concealed the material fact that BERNSTEIN was not a disinterested reference for FURTH, but rather a principal partner in several of FURTH's business entities.

116. Defendants suppressed and concealed material facts with the intent to defraud and induce Plaintiff to act as follows:

    a.    To enter into contracts with Defendant FURTH and MILLENNIUM;

    b.    To issue Defendant FURTH 1,000,000 (one million) free-trading shares of the Company stock, which FURTH thereafter distributed to other Defendants;

    c.    To refrain from seeking other sources of equity financing; and

    d.    To pay FURTH and GARLIN approximately $71,000.

117. At the time Plaintiff acted, Plaintiff was unaware of the concealed or suppressed facts and would not have taken the action had Plaintiff known the true facts.

118. Because of Defendants' conduct, Plaintiff has been damaged in an amount according to proof at trial, but at least in excess of one million dollars ($1,000,000).

119. Because any and all consideration obtained by Defendants, and each of them, was obtained by deceit, Plaintiff prays for the return of all consideration given to or taken

1  by Defendants including, but not limited to, one million (1,000,000) shares of the
2  Company common stock and payments to FURTH in the amount of $71,000.00.

3      120.  Defendants, and each of them, acted with oppression, fraud and/or malice,
4  and Plaintiff is thereby entitled to and claims punitive damages, based upon Defendants'
5  actions, pursuant to Cal. Civ. Code §3294, et. seq., in an amount to be determined
6  according to proof.

7

8  **FOURTH CAUSE OF ACTION**

9  **(Promise without Intent to Perform-Inducement) (Cal. Civ. Code § 1710)**

10  **(Against Defendants Furth, Fixler, M. Attias, B. Attias, Garlin, Millennium, JAG**

11  **and Does 1-100)**

12      121.  Plaintiff hereby realleges and incorporates paragraphs 1 through 120 herein.

13      122.  Defendants FURTH, FIXLER and ATTIAS made a series of material
14  promises regarding the raising of equity capital without any intention of performing, as
15  follows:

16      123.  Defendants FURTH and GARLIN promised $3 million in equity financing
17  within "30-45 days" if the Company issued 1,000,000 shares to FURTH;

18      124.  Defendants, through Defendant FIXLER, promised a "quick capital" raise of
19  $100,000 to $500,000 "until the major raise;"

20      125.  Defendants, through Defendant FIXLER, promised that the defendant
21  "Group" would raise the "entire $3 million in equity financing;"

22      126.  The "Group," through Defendants ATTIAS and FIXLER, made numerous
23  statements and promises that Plaintiff's "money problems" would be over on a series of
24  future dates (for example, "By next Wednesday all your money problems will be over")
25  because, according to Defendants, Defendants' investors had signed agreements and
26  Defendants were gathering the signed checks for mailing or couriering to Plaintiff;

27      127.  On or about December 5, 2007, Defendant FIXLER told Johnson and

28

Reincke, via telephone, that the Group had "lined up" over a million dollars in an equity investment from an institutional fund which would be provided to Plaintiff after January 1, 2008;

128.    Defendants promised Plaintiff numerous meetings, discussions and contacts with "major investors" that never occurred.

129.    Defendants' promises without any intention of performance were made with the intent to defraud and induce Plaintiff to rely upon those promises and to act as follows:

a.    To enter into contracts with Defendant FURTH and MILLENNIUM;

b.    To issue Defendant FURTH 1,000,000 (one million) free-trading shares of the Company stock, which FURTH thereafter distributed to other Defendants;

c.    To refrain from seeking other sources of equity financing;

d.    To enter into contracts with new suppliers (in reliance on the contracts with those suppliers being funded by the promised equity raise), the public announcement of which would allow Defendants to promote their short-swing profit scheme;

e.    To enter into contracts to expand Plaintiff's business operations, including but not limited to the hiring of new employees and the leasing of additional business facilities (in reliance on those additional costs being funded by the promised equity raise), the public announcement of which would allow Defendants to promote their short-swing profit scheme; and

f.    To accede to Defendants' demands for confidential shareholder information so that Defendants' could more readily effectuate their scheme and plan to obtain short-swing profits and other profits from the sale of Plaintiff's stock.

130.    At the time Plaintiff acted, Plaintiff was unaware of Defendants' intention not to perform the promises specified above.

131.    Plaintiff acted in justified reliance on the promises made by Defendants.

132.    In justified reliance on the promises made by Defendants, Plaintiff was

induced to act as follows:

   a.   Plaintiff entered into contracts with Defendant FURTH and MILLENNIUM;

   b.   Plaintiff issued Defendant FURTH 1,000,000 (one million) free-trading shares of the Company stock, which FURTH thereafter distributed to other Defendants;

   c.   Plaintiff refrained from seeking other sources of equity financing;

   d.   Plaintiff entered into contracts with new suppliers, in reliance on the contracts with those suppliers being funded by the promised equity raise;

   e.   Plaintiff entered into contracts to expand Plaintiff's business operations, including but not limited to the hiring of new employees and the leasing of additional business facilities, in reliance on those additional costs being funded by the promised equity raise.

   133.   At the time Plaintiff acted, Plaintiff was unaware of Defendants' intention not to perform the promise(s).

   134.   Because of Defendants' conduct, Plaintiff has been damaged in an amount according to proof at trial, but at least in excess of one million dollars ($1,000,000).

   135.   Because any and all consideration obtained by Defendants, and each of them, was obtained by deceit, Plaintiff prays for the return of all consideration given to or taken by Defendants including, but not limited to, one million (1,000,000) shares of the Company common stock and payments to FURTH in the amount of $71,000.00.

   136.   Defendants, and each of them, acted with oppression, fraud and/or malice, and Plaintiff is thereby entitled to and claims punitive damages, based upon Defendants' actions, pursuant to Cal. Civ. Code §3294, et. seq., in an amount to be determined according to proof.

   ////

**FIFTH CAUSE OF ACTION**

**(Fraud and Deceit in the Execution) (Cal. Civ. Code § 1710)**

**(Against Defendants Furth, Fixler, M. Attias, B. Attias, Garlin, Bernstein,**

**Millennium, JAG and Does 1-100)**

137.   Plaintiff hereby realleges and incorporates paragraphs 1 through 136 herein.

138.   Subsequent to the making of the fraudulent contracts as alleged in Causes of Action 2-4 herein Defendants, and each of them, committed the following deceits in furtherance and execution of their fraudulent scheme and plan against Plaintiff:

a.     FURTH transferred large blocks of the S-8 stock he had received as a consultant to other members of the Group;

b.     The Group used the S-8 stock to create a market in Plaintiff's stock;

c.     The Group improperly influenced the market for the Company's common stock by effecting "wash" trades between and among members of the Group to manipulate reported price and volume information for the Company's common stock;

d.     The Group demanded that Plaintiff's officers and employees assist the Group in manipulating the market for the Company common stock;

e.     When Plaintiff's officers and employees refused to assist the Group in manipulating the market for the Company common stock, the Group began a campaign of intimidation and threats, as evidenced by a constant barrage of vile, scatological emails from Defendant FURTH, with the approval of FIXLER, ATTIAS, BERNSTEIN and GARLIN, threatening the economic ruin of Plaintiff's business and dire consequences for Johnson and Reincke, personally, unless they "cooperated" with the Group.  Copies of several examples of these emails are attached hereto as Exhibit "11" hereto.

f.     The Group further interfered with Plaintiff's equity raising activities by misrepresenting to Cowie and Krohnfeldt that the first five hundred thousand dollars ($500,000) in equity financing had been raised by the Group and delivered to Plaintiff.

139.   Defendants' promises without any intention of performance were made with

the intent to defraud and induce Plaintiff to rely upon those promises and to act as follows:

    a.    To enter into contracts with Defendant FURTH and MILLENNIUM;

    b.    To issue Defendant FURTH 1,000,000 (one million) free-trading shares of the Company's stock, which FURTH thereafter distributed to other Defendants;

    c.    To refrain from seeking other sources of equity financing;

    d.    To enter into a purported "short term bridge loan" with Defendant JAG;

    e.    To enter into contracts with new suppliers (in reliance on the contracts with those suppliers being funded by the promised equity raise), the public announcement of which would allow Defendants to promote their short-swing profit scheme;

    f.    To enter into contracts to expand Plaintiff's business operations, including but not limited to the hiring of new employees and the leasing of additional business facilities (in reliance on those additional costs being funded by the promised equity raise), the public announcement of which would allow Defendants to promote their short-swing profit scheme; and

    g.    To accede to Defendants' demands for confidential shareholder information so that Defendants could more readily effectuate their scheme and plan to obtain short-swing profits and other profits from the sale of Plaintiff's stock.

140.    At the time Plaintiff acted, Plaintiff was unaware of Defendants' intention not to perform the promises specified above.

141.    Plaintiff acted in justified reliance on the promises made by Defendants.

142.    Because of Defendants' conduct, Plaintiff has been damaged in an amount according to proof at trial, but at least in excess of one million dollars ($1,000,000).

143.    Because any and all consideration obtained by Defendants, and each of them, was obtained by deceit, Plaintiff prays for the return of all consideration given to or taken by Defendants including, but not limited to, one million (1,000,000) shares of the Company common stock and payments to FURTH in the amount of $71,000.00.

144.   Defendants, and each of them, acted with oppression, fraud and/or malice, and Plaintiff is thereby entitled to and claims punitive damages, based upon Defendants' actions, pursuant to Cal. Civ. Code §3294, et. seq., in an amount to be determined according to proof.

## SIXTH CAUSE OF ACTION

### Conspiracy To Defraud

### (Against Defendants Furth, Fixler, M. Attias, B. Attias, Garlin, Bernstein, Comprehensive Financial Services, The Signature Fund, Signature Management, Millennium, JAG and Does 1-100)

145.   Plaintiff hereby realleges and incorporates paragraphs 1 through 144 herein.

146.   Prior to August, 2007 Defendants Furth, Fixler, M. Attias, B. Attias, Garlin, Bernstein, Comprehensive Financial Services, The Signature Fund, Signature Management, Millennium, JAG and Does 1-100 entered into agreements to defraud Plaintiff.

147.   Defendants, and each of them, conspired to induce Plaintiff into entering into agreements with Defendant FURTH and MILLENNIUM and thereby defraud Plaintiff.

148.   Defendants, and each of them, conspired to defraud Plaintiff as alleged herein by concealing material facts from Plaintiff.

149.   Defendants, and each of them, conspired to defraud Plaintiff as alleged herein by making promises without intent to perform.

150.   Defendants, and each of them, conspired to defraud Plaintiff as alleged herein by acts of deceit designed to deprive Plaintiff of money and stock, and manipulate Plaintiff's stock in violation of law.

151.   At all relevant times Defendants, and each of them, as alleged, agreed to commit the acts of fraud as herein alleged, and concurred in the scheme to defraud Plaintiff with knowledge of their unlawful conduct, acts and purpose.

152.   At the time Plaintiff acted, Plaintiff was unaware of Defendants' intention to defraud and conspiracy to defraud as alleged herein.

153.   Plaintiff acted, as Defendants agreed and intended, in justified reliance on the promises, acts and misrepresentations made by Defendants in furtherance of their conspiracy to defraud Plaintiff; or Plaintiff acted, as Defendants agreed and intended, without adequate information because of the omissions committed by Defendants in furtherance of their conspiracy to defraud Plaintiff.

154.   Because of Defendants' conduct, Plaintiff has been damaged in an amount according to proof at trial, but at least in excess of one million dollars ($1,000,000).

155.   Because any and all consideration obtained by the conspiring Defendants, and each of them, was obtained by deceit, Plaintiff prays for the return of all consideration given to or taken by Defendants including, but not limited to, one million (1,000,000) shares of the Company common stock and payments to FURTH in the amount of $71,000.00.

156.   Defendants, and each of them, acted with oppression, fraud and/or malice, and Plaintiff is thereby entitled to and claims punitive damages, based upon Defendants' actions, pursuant to Cal. Civ. Code §3294, et. seq., in an amount to be determined according to proof.

## SEVENTH CAUSE OF ACTION

### Claim and Delivery Against All Defendants

157.   Plaintiff hereby realleges and incorporates paragraphs 1 through 156 herein.

158.   Defendant FURTH, through the acts of fraud and deceit as herein alleged, wrongfully obtained one million shares of the Company's free-trading common stock.

159.   At no time did Defendant FURTH, or any Defendant or any person or entity owned or controlled by Defendants, have the right to ownership of that stock.

160.   Defendant FURTH caused the stock to be distributed, in violation of its

status as "S-8" stock, to Defendants M. ATTIAS, B. ATTIAS, FIXLER, and Does 1-100, and other accounts owned, operated or controlled by or related to Defendants.

161.   Defendants FURTH, M. ATTIAS, B. ATTIAS, FIXLER and Does 1-100 individually, and through other accounts owned, operated and/or controlled by them, caused some or all of the stock to be distributed and placed at Defendant brokerage firms LEGENT CLEARING LLC, UBS FINANCIAL SERVICES, INC., NATIONAL FINANCIAL SERVICES LTD. aka FIDELITY INVESTMENTS NATIONAL FINANCIAL SERVICES and eTRADE SECURITIES, and Does 101-200.

162.   At all times relevant hereto, Plaintiff was entitled to sole legal ownership of the one million shares of stock wrongfully obtained by Defendants and entitled to exclusive possession of same.

163.   Plaintiff demands the return of the stock wrongfully obtained by the Group Defendants, now held by the named brokerage firms in the names of the named Defendants FURTH, FIXLER, M. ATTIAS, B. ATTIAS, Does 1-100 and all other accounts owned, operated or controlled by or related to any named Defendant in any way.

Wherefore, Plaintiff prays for the return of stock, improperly obtained by the Group Defendants, now held by Defendants and/or the brokerage firms named herein.

**PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF respectfully prays for relief as follows:

**ON THE FIRST CAUSE OF ACTION**:

1.     Disgorgement of all short-swing profits, by all Defendants, in an amount to be determined at time of trial.

**ON THE SECOND CAUSE OF ACTION:**

2.     The return of all consideration given to or taken by Defendants including, but not limited to, one million (1,000,000) shares of the Company common stock and

payments to FURTH in the amount of $71,000.00.

    3.     Damages, based upon Defendants' fraud, in an amount according to proof at time of trial.

    4.     Punitive damages, pursuant to Cal. Civ. Code §3294, et. seq.

**ON THE THIRD CAUSE OF ACTION:**

    5.     The return of all consideration given to or taken by Defendants including, but not limited to, one million (1,000,000) shares of the Company common stock, and payments to FURTH in the amount of $71,000.00.

    6.     Damages, based upon Defendants' fraud, in an amount according to proof at time of trial.

    7.     Punitive damages, pursuant to Cal. Civ. Code §3294, et. seq.

**ON THE FOURTH CAUSE OF ACTION:**

    8.     The return of all consideration given to or taken by Defendants including, but not limited to, one million (1,000,000) shares of the Company common stock and payments to FURTH in the amount of $71,000.00.

    9.     Damages, based upon Defendants' fraud, in an amount according to proof at time of trial.

    10.    Punitive damages, pursuant to Cal. Civ. Code §3294, et. seq.

**ON THE FIFTH CAUSE OF ACTION**

    11.    The return of all consideration given to or taken by Defendants including, but not limited to, one million (1,000,000) shares of the Company common stock, and payments to FURTH in the amount of $71,000.00.

    12.    Damages, based upon Defendants' fraud, in an amount according to proof at time of trial.

    13.    Punitive damages, pursuant to Cal. Civ. Code §3294, et. seq.

**ON THE SIXTH CAUSE OF ACTION**

    14.    The return of all consideration given to or taken by Defendants including, but

not limited to, one million (1,000,000) shares of the Company common stock and payments to FURTH in the amount of $71,000.00.

15.    Damages, based upon Defendants' fraud, in an amount according to proof at time of trial.

16.    Punitive damages, pursuant to Cal. Civ. Code §3294, et. seq.

**ON THE SEVENTH CAUSE OF ACTION**

17.    The return of all one million (1,000,000) shares of the Company common stock.

18.    Damages, in an amount according to proof at time of trial.

**ON EACH CAUSE OF ACTION:**

19.    Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

20.    Pre-Judgment and Post-Judgment interest, as provided by law; and

21.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

**DEMAND FOR JURY TRIAL**

1. Plaintiff hereby requests a trial by jury in this action.

Dated:  August 5, 2008

John M. Haytol
Attorney for Plaintiff

Table of Contents for Exhibits

| Exhibit Number | Page(s) | Description |
|---|---|---|
| 1 | 34-38 | Millennium incorporation documents |
| 2 | 39 | Notice of cancellation of articles of Incorporation of Millennium |
| 3 | 40 | August 25, 2007 email from Reincke to Defendant Furth |
| 4 | 41-49 | September 6, 2007 consulting agreement between Plaintiff and Defendant Furth |
| 5 | 50-59 | September 6, 2007 financing agreement Between Plaintiff and Millennium |
| 6 | 60 | September 18, 2007 email from Defendant Furth to Johnson |
| 7 | 61 | October 9, 2007 email from Defendant Furth to Plaintiff |
| 8 | 62 | October 9, 2007 email from Defendant Fixler to Plaintiff |
| 9 | 63 | December 30, 2007 email from Defendant Garlin to Plaintiff |
| 10 | 64-65 | Letter dated Feb. 17, 2006 from Phillip Offill, Jr. to Defendant Furth |
| 11 | 66-77 | Emails from Defendant Furth to Plaintiff dated January 28, 2008 through June 2, 2008 |

FIRST AMENDED COMPLAINT FOR DAMAGES

DOC ID =>    199811402262

| | DATE | DOCUMENT NO | DESCRIPTION | | FILING | EXPED | PENALTY | CERT | COPY |
|---|---|---|---|---|---|---|---|---|---|
| 1. | 8/6/1998 | 199811402262 | ARF DOMESTIC ARTICLES/FOR PROFIT | | 65.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | TOTAL | 65.00 | 0.00 | 0.00 | 0.00 | 0.00 |

**Return To:**
**ROETZEL & ANDRESS**
**1375 E 9TH ST.**
**CLEVELAND, OH 44114**

-------------- cut along the dotted line --------------



# *The State of Ohio*
## ❖ *Certificate* ❖

### *Secretary of State - Bob Taft*

### *1019599*

It is hereby certified that the Secretary of State of Ohio has custody of the business records for *MILLENNIUM CONSULTING GROUP, INC.* and that said business records show the filing and recording of:

**Document:**
DOMESTIC ARTICLES/FOR PROFIT

**Document No(s):**
199811402262

United States of America
State of Ohio
Office of the Secretary of State



Witness my hand and the seal of the Secretary
of State at Columbus, Ohio, This 14th day of
July, A.D. 1998

*Bob Taft*
Bob Taft
Secretary of State

Exhibit 1
34

## ARTICLES OF INCORPORATION

### OF

### MILLENNIUM CONSULTING GROUP, INC.

The undersigned, desiring to form a corporation for profit under the General Corporation Law of the State of Ohio, does hereby state the following:

**FIRST.** The name of said corporation shall be Millennium Consulting Group, Inc.

**SECOND.** The place in Ohio where its principal office is to be located is Aurora, Portage County.

**THIRD.** The purpose for which said corporation is formed is:

To engage in any lawful act or activity for which corporations may be formed under the General Corporation Law of the State of Ohio, and to have all of the rights, powers and privileges now or hereafter conferred by the laws of the State of Ohio upon corporations organized and existing under said General Corporation Law or under any act amendatory thereof, supplemental thereto or substituted therefor.

**FOURTH.** The maximum number of shares which the corporation is authorized to have outstanding is eight hundred fifty (850) shares of voting common stock, all of which shall be without par value.

**FIFTH.** A director or officer of the corporation shall not be disqualified by his office from dealing or contracting with the corporation as a vendor, purchaser, lessor, lessee, employee, agent or otherwise; nor shall any transaction, contract or act of the corporation be void or voidable or in any way affected or invalidated by reason of the fact that any director or officer or any firm of which such director or officer is a member or any

corporation of which such director or officer is a shareholder, director or officer, is in any way interested in such transaction, contract or act, provided that the fact that such director, officer, firm or corporation is so interested shall be disclosed or shall be known to the board of directors or such members thereof as shall be present at any meeting of the board of directors at which action upon any such contract, transaction or act shall be taken. A director or officer of the corporation shall not be accountable or responsible to the corporation for or in respect of any such transaction, contract or act of the corporation, or for any gain or profit realized by him by reason of the fact that he or any firm of which he is a member, or any corporation of which he is a shareholder, officer or director, is interested in such transaction, contract or act. Any such director or officer, if such officer is a director, may be counted in determining the existence of a quorum at any meeting of the board of directors of the corporation which shall authorize, ratify or approve any such contract, transaction or act; and he may vote thereat to authorize or take action in respect of any such contract, transaction or act, with like force and effect as if he or any firm of which he is a member or any corporation of which he is a shareholder, officer or director, were not interested in such transaction, contract or act.

**SIXTH.** All directors may severally or collectively consent in writing to any action to be taken by the board of directors, and such action shall be as valid a corporate action as though it had been authorized at a duly held meeting of the board of directors. Said writing or writings, signed by all of the members of the board of directors, shall be filed with or entered upon the records of the corporation. A majority of the whole authorized number of directors may ratify any act of any officer of the corporation.

**SEVENTH.** The corporation, through its board of directors, shall have the right, power and authority to repurchase any of its outstanding shares at such price and upon such terms as may be agreed upon between the corporation and the selling shareholder or shareholders.

-2-

IN WITNESS WHEREOF, the undersigned has subscribed these Articles of Incorporation this ___ day of April, 1998.

R & A Agents, Inc.

By: _____

J. Timothy Bemler
Vice President

-3-



Prescribed by
Bob Taft, Secretary of State
30 East Broad Street, 14th Floor
Columbus, Ohio 43266-0418
Form AGO (August 1992)

# ORIGINAL APPOINTMENT OF STATUTORY AGENT

The undersigned, being at least a majority of the incorporators of _____
_____ MILLENNIUM CONSULTING GROUP, INC. _____ hereby appoint
_____(name of corporation)_____
_____ REA Agents, Inc. _____
_____(name of agent)_____ to be statutory agent upon whom any
process, notice or demand required or permitted by statute to be served upon the corporation may
be served. The complete address of the agent is:
____ 1375 East 9th Street, One Cleveland Center, Suite 1650 ____
_____(street address)_____

_____ Cleveland _____
_____(city)_____ Ohio ___ 44114 ___
NOTE: P.O. Box addresses are not acceptable.              (zip code)

REA AGENTS, INC.
By:_____ (Incorporator)
    J. Timothy Bender
    Vice President

_____ (Incorporator)

_____ (Incorporator)

## ACCEPTANCE OF APPOINTMENT

The undersigned, ____ REA Agents, Inc. ____
_____ Millennium Consulting Group, Inc. _____ named herein as the statutory agent for
_____(name of corporation)_____ hereby acknowledges and accepts the
appointment of statutory agent for said corporation.

REA AGENTS, INC.
By:_____
    J. Timothy Bender, Vice President    Statutory Agent

## INSTRUCTIONS

1) Profit and non-profit articles of incorporation must be accompanied by an original appointment of agent. R.C.
   1701.07(B), 1702.06(B).

2) The statutory agent for a corporation may be (a) a natural person who is a resident of Ohio, or (b) an Ohio corpora-
   tion or a foreign profit corporation licensed in Ohio which has a business address in this state and is explicitly
   authorized by its articles of incorporation to act as a statutory agent. R.C. 1701.07(A), 1702.06(A).

3) An original appointment of agent form must be signed by at least a majority of the incorporators of the corporation.
   R.C. 1701.07(B), 1702.06(B). These signatures must be the same as the signatures on the articles of incorporation.

* As of October 8, 1992, R.C.1701.07(B) will be amended to require acknowledgement and acceptance by the appointed
statutory agent.

38



J. Kenneth Blackwell, Secretary of State
30 East Broad Street
Lower Level
Columbus, Ohio 43215

Re:  MILLENNIUM CONSULTING GROUP, INC.
Charter / License No:    1019599                                                                August 16, 2006
Original Date:  7/14/1998

R&A AGENTS, INC.
1375 E 9TH ST STE 1650
CLEVELAND, OH 44114-0000

The tax commissioner has certified that the above named corporation failed to file necessary corporate franchise tax reports or pay any such taxes within the time prescribed by law. Therefore, in accordance with Ohio Revised Code (O.R.C.) Section 5733.20, you are hereby notified that the Office of the Secretary of State has cancelled the Articles of Incorporation/Certificate of Authority for the above named corporation as of August 16, 2006.

Further, the Office of the Secretary of State shall notify the County Recorder of the county in which the principal place of business of the corporation in this state is located that this cancellation has taken place.

While cancelled, O.R.C. Section 5733.21 prohibits any person from exercising or attempting to exercise "any powers, privileges, or franchises under the articles of incorporation or certificate of authority."

### Reinstatement of a Corporation

A corporation whose articles of incorporation or certificate of authority have been cancelled pursuant to O.R.C. Section 5733.20 can apply for reinstatement by doing all of the following:

1.  Forward a copy of this cancellation notice to the Ohio Department of Taxation, Reinstatement Division, P.O. Box 182382, Columbus, Ohio 43218-2382 along with the following information:

    A.  The corporation's Ohio Corporate Franchise Tax Identification Number assigned by the Ohio Department of Taxation's Corporate Franchise Tax Section.

    B.  The corporation's Federal Employer Identification Number (FEIN) assigned by the U.S. Internal Revenue Service.

    The Department of Taxation will inform the corporation what reports and taxes are required to be filed and paid. After the corporation has filed all reports and paid all taxes fees, and penalties the Department of Taxation will issue the corporation a "D-3" Certificate of Reinstatement.

2.  Forward the D-3 certificate to the Office of Secretary of State, P.O. Box 788, Columbus, OH 43216, together with a check or money order for the filing fee of $25.00. Please make the check/money order payable to the Ohio Secretary of State.

Once the Secretary of State's Office receives the D-3 certificate it will begin process of reinstatement on its records. When all required information has been provided, the Office of the Secretary of State will issue the corporation a formal "Certificate of Reinstatement."

Please be advised that the Secretary of State will not forward notice of reinstatement to the county recorders or other county authorities. It will be the responsibility of the corporation to notify county authorities of reinstatement if necessary.

If you have any questions regarding this cancellation notice, please call the Ohio Department of Taxation, Corporate Franchise Division at 614 387-0232.

Sincerely,

J. Kenneth Blackwell
Secretary of State

Exhibit 2
39

## Richard Reincke

**From:**    Richard Reincke [richard@firstresponderproducts.com]
**Sent:**    Saturday, August 25, 2007 12:36 PM
**To:**      'J926@aol.com'
**Subject:** First Responder Products

Doug — we'd like to propose engaging Millenium Consulting Group for $5,000 per month to assist in various matters relating to corporate financing; as a separate agreement, we'd be interested in retaining you, personally, through a consulting agreement that provides options to purchase up to 1,000,000 shares of FRPD's common stock at $0.75 per share exercise price, which can be exercised through a promissory note that will be forgivable for acceptable performance, as reviewed monthly. This would limit the potential adverse tax consequences for you while still giving us a mechanism to ensure performance and acquire certain services that will help us in our current business expansion.

This dual relationship would allow us to retain you personally for services that do not involve capital raising transactions or market making activities and therefore allow S-8 stock compensation, while paying Millenium cash compensation for those services which might be related to IR work, capital raising, corporate finance, or market making activities.

We are all very cognizant of the two primary areas of abuse that are strictly forbidden for S-8 stock issuances. First, companies fraudulently issue S-8 stock to nominal employees or consultants, who then sell the shares at the direction of (and for the benefit of) the issuer. Second, Form S-8 has been misused to register securities issued to compensate advisors who then use the shares to hype and/or promote the issuer's securities. These two specific misuses have routinely led to SEC investigations and prosecutions by SEC staff. (See http://www.sec.gov/litigation/admin/3-9597.htm, for a sample case.) We all want to make sure that we comport with the S-8 guidelines.

The following services have been explicitly outlined by the SEC as examples of services for which S-8 stock may be issued:

· Consultants who provide traditional product or corporate image advertising (except when done to promote a company's stock).
· Business development consultants retained to identify another company as a potential partner for technology development.
· Consultants who advise the issuer on business strategy or compensation policies.
· A consultant who arranges a bank credit line.
· Attorneys who represent an issuer in matters not in relation to its securities, such as litigation defense, securing U.S. Food and Drug Administration approval, or obtaining a patent.
· Attorneys who prepare the issuer's Exchange Act reports and proxy statements.
· Attorneys and other consultants who assist an issuer in identifying acquisition targets, or in structuring mergers or other acquisitions in which securities are issued as consideration, unless the acquisition is a typical reverse merger.

Let's talk Monday about some of the areas enumerated above in which we need consulting services. We appreciate your interest in the company.

   **First Responder**


**Richard Reincke | Chief Operating Officer/Chief Financial Officer**

**First Responder Products, Inc.**
15455 N. Greenway-Hayden Loop #C4 | Scottsdale, AZ 85260
480.619.4747 tel. | 480.619.4740 fax | 602.677.9520 cell


*Exhibit 3*
*40*

# CONSULTING AGREEMENT

This Consulting Agreement is being entered into as of September 1, 2007, by and between Douglas G. Furth (hereinafter "Consultant") and First Responder Products, Inc. (hereinafter "the Company"), whereby the Company has agreed to retain the services of the Consultant under the terms and conditions as set forth within the Consulting Agreement.

It is hereby acknowledged that the Company is desirous of retaining the services of the Consultant for assistance in various matters pertaining to corporate growth, strategic planning, public relations, and the expansion of the existing shareholder and equity base of the Company, and that the Consultant has agreed to provide such services to the Company in exchange for the due consideration as outlined within the subsequent portions of this Agreement.

## Section 1.                    Description of Consulting Services

Under the terms and conditions of this Agreement the Consultant has agreed to act in an advisory capacity to the Company and to provide such services in exchange for the due consideration as set forth within this Agreement. The scope of such services shall be described as providing general assistance to the Company in the areas of strategic alliances, mergers, acquisitions and various other matters as pertaining to growth and the enhancement of shareholder value.

Whereas the Consultant has agreed to act in an advisory capacity to the Company, the company understands and hereby acknowledges the fact that this is a non-exclusive arrangement, and that the Consultant is free to enter into any other such consulting and/or business agreement as he may deem necessary and desirable at any time. Such agreements may include additional consulting agreements, outside business ventures and/or investments as well as any other type of business and/or personal activity as the Consultant may desire. The Consultant shall maintain the right to enter into any such outside agreements and ventures, at his sole discretion.

As a further provision of this Agreement both the Consultant and the Company acknowledge and agree that there will not be any specific time requirement for utilization by either party, and that the consideration that is due the Consultant under the terms of this Agreement is unrelated to the amount of time that is spent providing such consulting services, and is considered as a fixed cost of this Agreement.

## Section 2.                    Disclaimers

In recognition and mutual acknowledgement of the fact that the Company is a company in its early stage and has minimal current revenue, income or liquid

*Exhibit 4*
41

market for its stock at this time the Consultant makes no representations, warranties or other affirmations as to the efficacy, viability and/or success of any efforts that may be undertaken on the Company's behalf, and the Company hereby acknowledges, accepts and understands such disclaimers as made by the Consultant.

## Section 3.          Due Consideration

As due consideration for the consulting services as provided by the Consultant to the Company under the terms and conditions as set forth within this Agreement, the company hereby agrees to the timely payment to the Consultant of the following amounts:

A monthly retainer in the amount of $25,000, payable on the fifteenth business day of each month, beginning on September 15, 2007 and running throughout the term of this Agreement. The Company shall pay this retainer in cash for the first two months of this Agreement. Beginning on November 15, 2007 the Company shall have the option of replacing the monthly cash retainer with any of the following options:

a. A $250,000 cash payment, plus 500,000 free-trading shares of the Company's stock;
b. A $125,000 cash payment, plus 700,000 free-trading shares of the Company's stock;
c. A $50,000 cash payment, plus monthly cash payments of $5,000 for the balance of the term of the Agreement, plus 800,000 free-trading shares;
d. A $25,000 cash payment, plus monthly cash payments of $5,000 for the balance of the term of the Agreement, plus 900,000 free-trading shares;
e. Monthly cash payments of $10,000 for the balance of the term of the Agreement, plus 1,000,000 free-trading shares;
f. Monthly cash payments of $5,000 for the balance of the term of the Agreement, plus 1,100,000 free-trading shares

In the event that the Company elects to substitute any of the options as are outlined in subheadings a-f above, the elected option shall replace the $25,000 monthly cash retainer. In the event that the Company does not elect any of the options as outlined in subheadings a-f above, the $25,000 monthly cash retainer shall remain in full force and effect throughout the term of this Agreement.

## Section 4.          Timely Payment

As a condition of this Agreement it is hereby understood that all obligations as incurred by the Company shall be paid to the Consultant in a timely manner. It is acknowledged that all such obligations shall become due and payable within the following timeframes:

    a.  The monthly retainers shall become due and payable upon the fifteenth business day of each month throughout the term of this Agreement;

    b.  Any elected alternative option shall become due and payable upon its election by the Company

## Section 5.          Conditions of Default

In the event that the Company fails to meet the Timely Payment and/or Due Consideration sections of this Agreement it shall be considered to be in default of its payment obligations to the Consultant.  In the event of a default the Consultant shall have the obligation to inform the Company of such a default in writing, and shall grant the Company a period not to exceed ten (10) business days within which it may move to cure such a condition through the payment of any and all outstanding obligations to the Consultant.  A default shall be considered as being any payment that has not been received within ten (10) business days of its due date.

In the event that the Company fails to cure such a default the Company shall be considered to be in breach of its contractual obligations to the Consultant, resulting in the following penalties:

    a.  The Consultant shall have no further obligation to the Company as a result of this Agreement and shall be released from any and all obligations to the Company immediately upon the notification to the Company of its default and the Company's subsequent failure to cure said default within the agreed upon timeframe.

    b.  In the event that the Company is in default of any of its Agreements with the Consultant or with any affiliated entity to the Consultant or its agents, contacts or business associates the Consultant shall have the right to consider this Agreement to be in default as well and to have the default provisions as contained herein enforced as if there had been a default under the terms and conditions of this Agreement.

## Section 6.          Term of the Agreement

The term of this Consulting Agreement shall run for a period of twelve (12) months from the date of its execution by all parties, with additional options for extension thereafter by mutual and written consent.  Throughout the initial term of this Agreement either party shall maintain the right to terminate the Agreement for any reason through the forwarding of a written notification to the other party, with the termination becoming effective upon the receipt by the other party of such written notification.  Regardless of the reason for termination the Consultant shall not be required to tender any Shares or Cash back to the Company.

Further, the Company shall not have the right to terminate this Agreement in the event that it is in default of any of its obligations hereunder.

As consideration for the Consultant to enter into this Agreement, the Company hereby agrees that it will not have the right to cancel this Agreement for the first three months of its term, regardless of reason.

## Section 7.        Transfer of Assets, Merger

Notwithstanding anything to the contrary herein, if (a) all or substantially all of the assets of the Company should be transferred (either by sale, exchange, foreclosure, liquidation, dissolution, repurchase or other disposition) to a corporation or other entity without the prior consent of the Consultant, this Agreement shall also continue to be binding upon both the Consultant as well as the transferee corporation and/or entity, and the Company shall make adequate provisions within such transactional documentation for the assignment and assumption of this Agreement, with the Company remaining jointly and severally liable hereunder.

## Section 8.        Liability and Indemnification

Because the duties and services of the Consultant may require and/or be uncontrollably influenced by the decisions of third parties, no statement, representation or warranty can be or is made by the Consultant as to the result of his services.  The Consultant shall not be held liable, whether in contract, tort, negligence or otherwise for any special, indirect, economic or consequential damages or for any damages arising from or attributable to the failure to realize the goals of the Company and/or its affiliates' profits, cash flows, savings, loss of data, capital downtime, loss of use, loss of goodwill, loss of anticipated or actual revenue or profit, or any other economic dislocation whatsoever.  The Consultant shall not, under any circumstance whatsoever, be held as liable to the Company or any person or entity for any mistakes, errors in judgment or for any act or omission believed by it in good faith to be within the scope of its authority hereunder, regardless of whether such act or omission in any way fails to achieve the purposes of this Agreement, or for any other claim or theory advanced by any such person or entity.

The Consultant shall be indemnified and held harmless by the Company and any of its affiliates from all loss, cost or expense in respect to any and all such claims, such parties advancing or paying as incurred all such loss, cost or expense of the Consultant.  The Consultant is not exculpated hereby to the extent that it would be liable to the Company for fraud or gross negligence in the performance of its duties and services hereunder.  The Consultant shall not be held to have incurred any liability to the Company or any person or entity by virtue of any action taken by him or allegedly failed to be taken by him in the good faith attempt to discharge his duties and services.  In no event shall any liability of the

*44*

Consultant exceed the value of the total compensation and consideration (excluding any reimbursement for expenses) as set forth under the terms and conditions of this Agreement and as already paid to the Consultant thereunder.

### Section 9.    Authority

The Company and any affiliates hereby warrant and represent that they have the full power and authority to execute and deliver this Agreement to the Consultant and to perform the obligations as contained herein, and that this Agreement has been duly authorized, executed and delivered by the Company and any affiliates and further constitutes a valid, binding and legally enforceable obligation of the Company and any affiliates.  Each party has read and understood this Agreement.

### Section 10.    Notices, etc.

All notices and other communications hereunder shall be in writing and shall be deemed to have been given either; when hand delivered to the addressee's office, or three (3) days after being mailed by first class, registered or certified mail, postage prepaid, addressed as follows:

  a.  If to the Consultant to: Douglas G. Furth, 6442 Dorset Lane, Solon, Ohio 44139, or to any other such person(s) and/or addresses as may be furnished, in writing, to the Company by the Consultant
  b.  If to the company to: Eric Johnson, c/o First Responder Products, Inc., 15455 North Greenway-Hayden Loop, #C4, Scottsdale, Arizona 85260 or to any other such person(s) and/or addresses as may be furnished, in writing to the Consultant by the Company

### Section 11.    Entire Agreement

The parties hereto agree that this Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, that that this Agreement supersedes any and all prior agreements and understandings between the parties with regard to such subject matter, and that there are no restrictions, agreements, arrangements, either oral or written, between the parties relating to the subject matter hereof which are not fully and accurately expressed or referred to herein.

### Section 12.    Waivers

Any waiver of the terms and/or conditions as set forth within this Agreement shall not operate as a waiver of any other breach or claim of such terms or conditions or any other term or condition, nor shall any failure to enforce any provisions hereof operate as a waiver of such provision or of any other provision hereof.  No waiver, unless it by its own terms explicitly so provides, shall be construed to

effect a continuing waiver in any other instance or for any other purpose, or impair the right of the party against whom such waiver is claimed, in all other instances or for all other purposes, to require full compliance with such provision.

**Section 13.          Further Amendments**

Each of the parties hereto agrees to execute all such further instruments and documents and to take all such further action as the other party may reasonably require in order to effectuate the terms, conditions and purposes of this Agreement.

**Section 14.          Amendments**

This Agreement may not be amended, nor shall any waiver, change, modification, consent or discharge be effected, except by an instrument in writing fully executed by the party against whom enforcement of any amendment, waiver, change, modification, consent or discharge is sought.

**Section 15.          Assignment; Successors and Assigns**

This Agreement shall, except as hereinafter or as in Section 7 provided, not be assignable by either party without the receipt of the prior written consent of the other; provided however that this Agreement may be assigned by the Consultant to any subsidiary and/or affiliated company of the Consultant, with such assignment releasing the assignor. This Agreement may also be assigned pursuant to a sale of substantially all of the assets of the Consultant's practice with or to a party acceptable to the Company, which party shall have assumed the Consultant's obligations hereunder pursuant to an agreement in form and substance reasonably satisfactory to the Company. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors in interest (whether by merger, consolidation or similar transaction), and permitted assigns.

**Section 16.          No Partnership Authority**

Nothing as contained within this Agreement is intended to create, nor shall any provision hereof be construed so as to create, a partnership, joint venture, coadventure or joint undertaking by and among the Consultant and the Company, or to further constitute the consultant as an agent of the Company, it being the express intention of the parties hereto that the relationship created hereby shall be that of separate and independent contractors acting at all times in their sole and individual capacities. The Consultant shall have no authority to act on behalf of the Company in any matter except as expressly outlined within this Agreement, or as may be agreed upon otherwise, in writing.

**Section 17.**        **Access; Assistance; Information: Compliance with Law**

a. In connection with the Consultant's engagement as contemplated by and through this Agreement the Company and any affiliates hereby agree to furnish the Consultant and any of his designates with all information concerning the Company and any affiliates which the Consultant reasonably deems as being appropriate, and will provide the Consultant with access to, assistance from, availability for communications and meetings with, the Company's and any affiliates files, officers, directors, accountants, counsel, investment bankers, broker-dealers, marketmakers and other outside advisors. The Company represents and warrants to the Consultant that all such information is and will be truthful and accurate in all material respects and that it does not nor will not contain any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company acknowledges that the Consultant will be utilizing and relying upon the accuracy and completeness of the information supplied by or on behalf of the Company and its officers in connection with its engagement without independent verification, and that the Consultant does not assume responsibility for the accuracy and completeness of any such information. The Company will promptly notify the Consultant in writing in the event that it learns of any material inaccuracy in or material omissions from, any information as previously delivered to the Consultant, including, particularly, the financial projections of the Company and any affiliates.

b. The burden of compliance with law for all matters concerning the Company and any affiliates and/or entities which either have or may be contemplating the issuance of Securities, rests with the Company and any such affiliate or entity. Although the Consultant may offer its practical advice or offer comments or observations regarding such matters, he shall not be deemed to provide legal or accounting advice or services, nor to be the maker, author, publisher or be responsible for any statement, representation or misstatement, misrepresentation, omission or alleged misstatement, alleged misrepresentation or alleged omission.

**Section 18.**        **Severability**

In the event that any provision of this Agreement shall be held or deemed to be, or shall in fact be invalid, inoperative or unenforceable as applied to any particular case in any jurisdiction or jurisdictions, or in all jurisdictions or cease, because of conflict of any provision with any constitution or statute or rule of public policy or for any other reason, such circumstance shall not have the effect of rendering the provision or provisions herein contained invalid, inoperative or unenforceable, to the extent that such other provisions are not themselves

actually in conflict with such constitution, statute or rule of public policy, but this Agreement shall be reformed and construed in any such jurisdiction or case as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted in such jurisdiction or in such case, except when such construction could operate as an undue hardship on either party, or constitute a substantial deviation from the general intent and purpose of such party is reflected within this Agreement. For purposes of interpretation, no party shall be deemed the drafter of this Agreement.

**Section 19.        Counterparts**

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and in pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one of such counterparts signed by the party against whom enforcement is sought. Fax signatures shall be valid as originals or copies.

**Section 20.        Section Headings**

The headings as utilized throughout this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement

**Section 21.        Gender**

Whenever used herein the singular noun shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders.

**Section 22.        Governing Law**

This Agreement shall be governed by and construed and enforced in accordance with the internal law of the State of Ohio, without regard to the principals of conflicts of laws.   The parties agree that prior to the onset of any litigation, they shall agree to submit to arbitration in an attempt to resolve any disputes that may arise out of this Agreement. The parties hereto agree that any disputes that may arise shall be resolved in the appropriate jurisdiction within the State of Ohio and that the prevailing party shall be entitled to recover any reasonable attorney's fees as well as other costs as may be associated with litigation.

IN WITNESS WHEREOF, the parties have executed or caused to be executed the Agreement as of the date first above written.

**First Responder Products, Inc.**

By: _Richard Veruccho_

Title: _Chief Operating Off_

Date: _9/6/2007_

**Douglas G. Furth**

By: _____

Title: _____

Date: _____

# FINANCING AGREEMENT

This Financing Agreement is being entered into as of September 1, 2007, by and between Millennium Consulting Group, Inc. (hereinafter "Consultant") and First responder Products, Inc. (hereinafter "the Company"), whereby the Company has agreed to retain the services of the Consultant under the terms and conditions as set forth within the Consulting Agreement.

It is hereby acknowledged that the Company is desirous of retaining the services of the Consultant for assistance in various matters pertaining to corporate finance and investment banking and the securing of additional financing for the Company, and that the Consultant has agreed to provide such services to the Company in exchange for the due consideration as outlined within the subsequent portions of this Agreement.

## Section 1.          Description of Services

Under the terms and conditions of this Agreement the Consultant has agreed to act in an advisory capacity to the Company and to provide such services in exchange for the due consideration as set forth within this Agreement. The scope of such services shall be described as providing general assistance to the company in the areas of corporate finance, investment banking, and various other matters as pertaining to financing and corporate capitalization.

Whereas the Consultant has agreed to act in an advisory capacity to the Company, the Company understands and hereby acknowledges the fact that this is a non-exclusive arrangement, and that the Consultant is free to enter into any other such consulting and/or business agreement as he may deem necessary and desirable at any time. Such agreements may include additional consulting agreements, outside business ventures and/or investments as well as any other type of business and/or personal activity as the Consultant may desire. The Consultant shall maintain the right to enter into any such outside agreements and ventures, at his sole discretion.

As a further provision of this Agreement both the Consultant and the Company acknowledge and agree that there will not be any specific time requirement for utilization by either party, and that the consideration that is due the Consultant under the terms of this Agreement is unrelated to the amount of time that is spent providing such consulting services, and is considered as a fixed cost of this Agreement.

As a condition of this Agreement the Consultant hereby agrees to undertake responsibility for the payment of all expenses incurred in the normal course of providing the consulting services that are stipulated under the terms of this Agreement, with such expenses being inclusive of the following items:

*Exhibit S*
50

1. All expenses relating to travel, lodging and entertainment while providing consulting services to the Company; and

2. All normal office expenses including telephone, facsimile and office supplies as incurred while providing consulting services to the Company

**Section 2.        Disclaimers**

In recognition and mutual acknowledgement of the fact that the Company is a company in its early revenue stage and has no income or liquid market for its stock at this time the Consultant makes no representations, warranties or other affirmations as to the efficacy, viability and/or success of any efforts that may be undertaken on the Company's behalf, and the Company hereby acknowledges, accepts and understands such disclaimers as made by the Consultant.

**Section 3.        Due Consideration**

As due consideration for the consulting services to be provided by the Consultant to the Company under the terms and conditions as set forth within this Agreement, the Company hereby agrees to the timely payment of the following to the Consultant;

1. A fee that is equivalent to five percent (5%) of the gross amount of the proceeds from any equity, quasi-equity or subordinated debt that is raised for the company by the Consultant, either through the Consultant's direct contacts or through any efforts that the Consultant may undertake on the Company's behalf.

2. A fee that is equivalent to the following formula, based upon the gross proceeds from any senior debt that is raised for the Company by the Consultant, either through the Consultant's direct contacts or through any efforts that the Consultant may undertake on the company's behalf:

| | |
|---|---|
| 5% of the first | $1,000,000 |
| 4% of the second | $1,000,000 |
| 3% of the third | $1,000,000 |
| 2% of everything thereafter | |

As a condition of this Agreement, subheadings 1-2 as listed above in the Due Consideration portion of this Agreement shall be considered as having survived the term of this Agreement, and shall remain in full force and effect until either of the following has occurred:

a. The contingent provisions have been fulfilled or.
a. One year has passed subsequent to the termination date of this Agreement

## Section 4.    Timely Payment

As a condition of this Agreement it is hereby understood that all obligations as incurred by the Company shall be paid to the Consultant in a timely manner. It is acknowledged that all such obligations shall become due and payable within the following timeframes:

a. The contingent payments as outlined in subheadings 1-2 above shall become due and payable upon the closing of any of the aforementioned transactions. The Company hereby agrees to execute any and all appropriate documents so as to make the requisite payments a part of any closing, with the proceeds being paid directly to the Consultant at the time of closing. The fees that are outlined within this Agreement are exclusive of any fees that may be charged or otherwise assessed by any outside parties for work and/or financing that may be conducted by them.

b. Any other expenses and distributions shall be considered as becoming due and payable upon notification to the Company by the Consultant

## Section 5.    Conditions of Default

In the event that the Company fails to meet the Timely Payment and/or Due Consideration sections of this Agreement it shall be considered to be in default of its payment obligations to the Consultant. In the event of a default the Consultant shall have the obligation to inform the Company of such a default in writing, and shall grant the Company a period not to exceed ten (10) business days within which it may move to cure such a condition through the payment of any and all outstanding obligations to the Consultant. A default shall be considered as being any payment that is more than ten (10) business days late.

In the event that the Company fails to cure such a default the Company shall be considered to be in breach of its contractual obligations to the Consultant, resulting in the following penalties:

a. The Consultant shall have no further obligation to the Company as a result of this Agreement and shall be released from any and all obligations to the Company immediately upon the notification to the Company of its default and the Company's subsequent failure to cure said default within the agreed upon timeframe.

b. In the event that the Company is in default of any of its Agreements with the Consultant or with any affiliated entity to the Consultant or its agents, contacts, or business associates the Consultant shall have the right to consider this Agreement to be in default as well and to have the default provisions as contained herein enforced as if there had been a default under the terms and conditions of this Agreement.

**Section 6.          Term of the Agreement**

The term of this Consulting Agreement shall run for a period of twelve (12) months from the date of its execution by all parties, with additional options for extension thereafter by mutual and written consent. Throughout the initial term of this Agreement either party shall maintain the right to terminate the Agreement through the forwarding of a written notification to the other party.

In the event that the Consultant elects to terminate the Agreement without cause prior to its expiration he shall be entitled to any and all payments and/or distributions as earned up to and including the termination date, but shall not be entitled to receive any unearned portions of the fees. It is acknowledged and agreed upon however that in the event that the Company concludes any transactions with any of the people, entities and/or companies that have been introduced to it by the Consultant or with whom the Consultant has initiated conversations on the Company's behalf, the Company shall be obligated for payment to the Consultant under the terms and conditions of this Agreement, for a period of two years subsequent to the termination.

In the event that the Company elects to terminate the Agreement for any reason whatsoever its obligations to the Consultant as set forth within the "Due Consideration" section of this Agreement shall be deemed to have survived such a termination and shall remain due and payable as if the Agreement were still in full force and effect.

The Company may not nullify and/or release itself from any of the payments and/or obligations to the Consultant throughout the initial term of this Agreement (and any extensions thereof) under any circumstances whatsoever.

This Agreement shall automatically renew in the event that any funding and/or other business is ongoing at the time of its expiration until such time as the funding and/or business has been concluded. The Company further agrees to be bound by the terms and conditions of this Agreement in the event that is consummates any funding and/or business transaction with anyone that may have been introduced to it, either directly or indirectly, by the Consultant, for a period of two years subsequent to the expiration date of this Agreement.

**Section 7.**          **Transfer of Assets, Merger**

Notwithstanding anything to the contrary herein, if (a) all or substantially all of the assets of the Company should be transferred (either by sale, exchange, foreclosure, liquidation, dissolution, repurchase or other disposition) to a corporation or other entity without the prior consent of the Consultant, this Agreement shall also continue to be binding upon both the Consultant as well as the transferee corporation and/or entity, and the Company shall make adequate provisions within such transactional documentation for the assignment and assumption of this Agreement, with the Company remaining jointly and severally liable hereunder.

**Section 8.**          **Liability and Indemnification**

Because the duties and services of the Consultant may require and/or be uncontrollably influenced by the decisions of third parties, no statement, representation or warranty can be or is made by the Consultant as to the result of his services. In no event shall the Consultant be held liable, whether in contract, tort, negligence or otherwise for any special, indirect, economic or consequential damages or for any damages arising from or attributable to the failure to realize the goals of the Company and/or its affiliates profits, cash flows, savings, loss of data, capital downtime, loss of use, loss of goodwill, loss of anticipated or actual revenue or profit, or any other economic dislocation whatsoever. The Consultant shall not, under any circumstance whatsoever, be held liable to the Company or any person or entity for any mistakes, errors in judgment or for any act or omission believed by him in good faith to be within the scope of his authority hereunder, regardless of whether such act or omission in ineffective or in any way fails to achieve the purposes of this Agreement, or for any other claim or theory advanced by any such person or entity. The Consultant shall be indemnified and held harmless by the Company and any of its affiliates from all loss, cost or expense in respect to any and all such claims, such parties advancing or paying as incurred all such loss, cost or expense of the Consultant. The Consultant is not exculpated hereby to the extent that the Consultant would be liable to the Company for fraud or gross negligence in the performance of his duties and services hereunder. The Consultant shall not be held to have incurred any liability to the Company or any person or entity by virtue of any action taken by him or allegedly failed to be taken by him in the good faith attempt to discharge his duties and services. In no event shall any liability of the Consultant exceed the value of the total compensation and consideration (excluding any reimbursement for expenses) as set forth under the terms and conditions of this Agreement and as already paid to the Consultant thereunder.

**Section 9.**          **Authority**

The Company and any affiliates hereby warrant and represent that they have the full power and authority to execute and deliver this Agreement to the Consultant

54

and to perform the obligations as contained herein, and that this Agreement has been duly authorized, executed and delivered by the Company and any affiliates and further constitutes and valid, binding and legally enforceable obligation of the Company and any affiliates. Each party has read and understood this Agreement.

### Section 10.        Notices, etc.

All notices and other communications hereunder shall be in writing and shall be deemed to have been given either; when hand delivered to the addressee's office, or three (3) days after being mailed by first class, registered or certified mail, postage prepaid, addressed as follows:

    a.  If to the Consultant to: Douglas G. Furth, 6442 Dorset Lane, Solon, Ohio 44139, or to any other such person(s) and/or addresses as may be furnished, in writing, to the Company by the Consultant

    b.  If to the Company to: Eric Johnson, c/o First Responder Products, Inc., 15455 North Greenway-Hayden Loop, #C4, Scottsdale, Arizona 85260, or to any other such person(s) and/or addresses as may be furnished, in writing to the Consultant by the Company

### Section 11.        Entire Agreement

The parties hereto agree that this Agreement constitutes the entire agreement between the parties with respect to the subject mater hereof, that that this Agreement supersedes any and all prior agreements and understandings between the parties with regard to such subject matter, and that there are no restrictions, agreements, arrangements, either oral or written, between the parties relating to the subject matter hereof which are not fully and accurately expressed or referred to herein.

### Section 12.        Waivers

Any waiver of the terms and/or conditions as set forth within this Agreement shall not operate as a waiver of any other breach or claim of such terms or conditions or any other term or condition, nor shall any failure to enforce any provisions hereof operate as a waiver of such provision or of any other provision hereof. No waiver, unless it by its own terms explicitly so provides, shall be construed to effect a continuing waiver in any other instance or for any other purpose, or impair the right of the party against whom such waiver is claimed, in all other instances or for all other purposes, to require full compliance with such provision.

**Section 13.**         **Further Amendments**

Each of the parties hereto agrees to execute all such further instruments and documents and to take all such further action as the other party may reasonably require in order to effectuate the terms, conditions and purposes of this Agreement.

**Section 14.**         **Amendments**

This Agreement may not be amended, nor shall any waiver, change, modification, consent or discharge be effected, except by an instrument in writing fully executed by the party against whom enforcement of any amendment, waiver, change, modification, consent or discharge is sought.

**Section 15.**         **Assignment; Successors and Assigns**

This Agreement shall, except as hereinafter or as in Section 7 provided, not be assignable by either party without the receipt of the prior written consent of the other; provided however that this Agreement may be assigned by the Consultant to any subsidiary and/or affiliated company of the Consultant, with such assignment releasing the assignor. This Agreement may also be assigned pursuant to a sale of substantially all of the assets of the Consultant's practice with or to a party acceptable to the Company, which party shall have assumed the Consultant's obligations hereunder pursuant to an agreement in form and substance reasonably satisfactory to the Company. This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors in interest (whether by merger, consolidation or similar transaction), and permitted assigns.

**Section 16.**         **No Partnership Authority**

Nothing as contained within this Agreement is intended to create, nor shall any provision hereof be construed so as to create, a partnership, joint venture, coadventure or joint undertaking by and among the Consultant and the Company, or to further constitute the Consultant as an agent or employee of the Company, it being the express intention of the parties hereto that the relationship created hereby shall be that of separate and independent contractors acting at all times in their sole and individual capacities. The Consultant shall have no authority to act on behalf of the Company in any matter except as expressly outlined within this Agreement, or as may be agreed upon otherwise, in writing.

**Section 17.**         **Access; Assistance; Information: Compliance with Law**

a. In connection with the Consultant's engagement as contemplated by and through this Agreement the Company and any affiliates hereby agree to furnish the Consultant and any of his designates with all information

concerning the Company and any affiliates which the Consultant reasonably deems as being appropriate, and will provide the Consultant with access to, assistance from, availability for communications and meetings with, the Company's and any affiliates files, officers, directors, accountants, counsel, investment bankers, broker-dealers, marketmakers and other outside advisors. The Company represents and warrants to the Consultant that all such information is and will be truthful and accurate in all material respects and that it does not nor will not contain any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company acknowledges that the consultant will be utilizing and relying upon the accuracy and completeness of the information supplied by or on behalf of the Company and its officers in connection with its engagement without independent verification, and that the Consultant does not assume responsibility for the accuracy and completeness of any such information. The Company will promptly notify the Consultant in writing in the event that it learns of any material inaccuracy in or material omissions from, any information as previously delivered to the Consultant, including, particularly, the financial projections of the Company and any affiliates.

b.  The burden of compliance with law for all matters concerning the Company and any affiliates and/or entities which either have or may be contemplating the issuance of Securities, rests with the Company and any such affiliate or entity. Although the Consultant may offer its practical advice or offer comments or observations regarding such matters, he shall not be deemed to provide legal or accounting advice or services, nor to be the maker, author, publisher or be responsible for any statement, representation or misstatement, misrepresentation, omission or alleged misstatement, alleged misrepresentation or alleged omission.

**Section 18.        Severability**

In the event that any provision of this Agreement shall be held or deemed to be, or shall in fact be invalid, inoperative or unenforceable as applied to any particular case in any jurisdiction or jurisdictions, or in all jurisdictions or cease, because of conflict of any provision with any constitution or statute or rule of public policy or for any other reason, such circumstance shall not have the effect of rendering the provision or provisions herein contained invalid, inoperative or unenforceable, to the extent that such other provisions are not themselves actually in conflict with such constitution, statute or rule of public policy, but this Agreement shall be reformed and construed in any such jurisdiction or case as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted in such jurisdiction or in such case, except when such construction could operate as an undue hardship on either

party, or constitute a substantial deviation from the general intent and purpose of such party is reflected within this Agreement. For purposes of interpretation, no party shall be deemed the drafter of this Agreement.

**Section 19.**        **Counterparts**

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and in pleading or proving any provision of this Agreement, it shall not be necessary to produce more than one of such counterparts signed by the party against whom enforcement is sought. Fax signatures shall be valid as originals or copies.

**Section 20.**        **Section Headings**

The headings as utilized throughout this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement

**Section 21.**        **Gender**

Whenever used herein the singular noun shall include the plural, the plural shall include the singular, and the use of any gender shall include all genders.

**Section 22.**        **Governing Law**

This Agreement shall be governed by and construed and enforced in accordance with the internal law of the State of Ohio, without regard to the principals of conflicts of laws. The parties hereto agree that any disputes that may arise shall be resolved in the appropriate jurisdiction within the State of Ohio. The parties further agree that prior to the onset of any litigation, they shall agree to arbitration in an attempt to resolve any disputes as may arise out of this Agreement. In the event of any disputes the prevailing party shall be entitled to receive reasonable attorney's fees as well as any other associated costs of litigation.

IN WITNESS WHEREOF, the parties have executed or caused to be executed the Agreement as of the date first above written.

First Responder Products, Inc.

By: _Richard Newdy_

58

Title: _Chief Operating Off._

Date: _9/06/2007_

**Millennium Consulting Group, Inc.**

By: _____

Title: _____

Date: _____

**Eric**

| | |
|---|---|
| **From:** | J926@aol.com |
| **Sent:** | Tuesday, September 18, 2007 2:25 PM |
| **To:** | eric@firstresponderproducts.com |
| **Cc:** | tlg_communications@yahoo.com; compfsv@sbcglobal.net; mjbmd@adelphia.net |
| **Subject:** | Deal Update - FRPD |

Dear Eric,

Here is where we now stand on things:

I have an interested party in the financing, in the approximate amount of $3 million. This financing is contingent upon the following set of terms and conditions at this point:

restricted stock at the $1.00 level
10% commission on the monies raised
a PR program being done, necessitating the activation of our 1,000,000 free-trading share payment

As soon as you give me the "go" signal we can get started. I am advised that the money raise can begin immediately and that it can be completed in about 30-45 days, per the funder. In order to get the deal finalized on my end, we will just need to do the slight modification to our Financing Agreement, making the commission 10% as opposed to 5%, and I will pay the fee. I will donate my 5% to the cause, so to speak.

I will need from you the thumbs up to this proposal and the appropriate documentation that you have used in the past to raise money, so that we can seek to shortcut the document preparation process.

I will look forward to hearing back from you soon.

Regards,

Doug

*Exhibit 6*
*60*

**Richard Reincke**

| | |
|---|---|
| **From:** | J926@aol.com |
| **Sent:** | Tuesday, October 09, 2007 9:18 AM |
| **To:** | eric@firstresponderproducts.com |
| **Cc:** | richard@firstresponderproducts.com; tlg_communications@yahoo.com; compfsv@sbcglobal.net; attlasml@yahoo.com |
| **Subject:** | To Do List |

Dear Eric and Richard,

We need your help on the following agenda items:

1. We need a PR for Thursday.....#3 on the list that you sent out to us. If you could please begin work on the text and circulate it for review that would be great.

2. We need for you to alter your Subscription Documents to read that the raise is for $500,000. When done, please send them out to us immediately so that we can get you some short-term money from our guys. Please make sure to get this as well as the text of the PR over to Michel ASAP!

Thanks.....

Regards,

Doug

*Exhibit 7*
61

**Richard Reincke**

From:    comp financial s [compfsv@sbcglobal.net]
Sent:    Tuesday, October 09, 2007 10:28 AM
To:      richard@firstresponderproducts.com
Subject: Fwd: To Do List

Richard,

    Can you please give us a offering doc with a mini max offering. The 506 is fine but we would like it to be $100,000.00 min and $500,000.00 max. This is just to get you some quick capital until the major raise. If you could email the new subscription doc to Michele that would be great.

                Thanks,

                 Mark

Note: forwarded message attached.

Exhibit 8
62

**Richard Reincke**

| | |
|---|---|
| **From:** | tim gartin [tlg_communications@yahoo.com] |
| **Sent:** | Sunday, December 30, 2007 8:34 PM |
| **To:** | eric johnson; Richard Reincke |
| **Cc:** | doug furth; compfsv@sbcglobal.net |
| **Subject:** | 250-500k |

Gentleman:

I spoke with one of my guys last night and mentioned to him what it is the company is doing and its financial needs and he said would they be interested in a 250-500k investor.  He is a major shareholder of a bank and they are looking for investments. So is this a guy that we want to talk to on Monday or Wednesday?

Tim


Be a better friend, newshound, and know-it-all with Yahoo! Mobile.

Exhibit 9
63

**Godwin | Pappas | Langley | Ronquillo**

Attorneys
A Limited Liability Partnership

DALLAS   HOUSTON

Renaissance Tower
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
214.939.4400
888.380.3545
214.939.3202 Fax

Godwinppgh.com

PHILIP W. OFFILL, JR.
Partner
Direct Dial:  214.939.4469
Direct Fax:  214.527.3173
poffill@godwinpappas.com

February 17, 2006

*Via E-Mail f926@aol.com*

Douglas Furth
6442 Dorset Lane
Solon, Ohio 44139

RE:   Ever-Glory International Group, Inc. (OTCBB:  EGLY)

Dear Mr. Furth:

Godwin Pappas Langley Ronquillo LLP represents Blue Chip IR and Shayla Investments, LLC. You received 175,000 shares of EGLY from Blue Chip and Shayla for purposes of providing financial public relations services for EGLY. You claimed that you would provide information to your clients and business associates targeted toward increasing market awareness regarding EGLY, and stated that such activities would, in a completely legal manner, enhance trading volume and prices.

It is apparent that your activities were, instead, intended to improperly influence the market for EGLY shares; you have now admitted to Mr. Zaric that rather than provide targeted financial public services, you have utilized your network of business associates to effect "matched" trades in EGLY shares for the purpose of manipulating reported volume and price information. Obviously, neither Blue Chip nor Shayla contemplated your unlawful acts; you should stop immediately.

Blue Chip and Shayla demand that you immediately return the EGLY shares you fraudulently induced them to deliver. We have provided notice of our demand, and of your unlawful activities, Wilson-Davis & Co., whom I understand you have been using in furtherance of your scheme. If I do not receive confirmation that you have instructed the return of these shares to Blue Chip and Shayla by close of business today, *this letter serves as notice that we*

*Exhibit 10*
*64*

February 17, 2006
Page 2

will commence a civil action seeking to restrain your further sale or transfer of EGLY shares and
for compensatory and punitive damages to the full extent permitted by law.

Very Truly Yours,

Phillip W. Offill, Jr.

65

**Richard Reincke**

From:     J926@aol.com
Sent:     Monday, January 28, 2008 12:58 PM
To:       eric@firstresponderproducts.com
Cc:       richard@firstresponderproducts.com; tlg_communications@yahoo.com; compfsv@sbcglobal.net; attiasml@yahoo.com
Subject:  Cooperation

Gentlemen,

No cooperation = no buying and no chance for financing.  The choice is yours.

Regards,

Doug

*Exhibit 11*
.66

**Richard Reincke**

| | |
|---|---|
| **From:** | J926@aol.com |
| **Sent:** | Monday, January 28, 2008 5:30 PM |
| **To:** | richard@firstresponderproducts.com |
| **Cc:** | eric@firstresponderproducts.com; tlg_communications@yahoo.com; compfsv@sbcglobal.net; attiasml@yahoo.com |
| **Subject:** | Re: For Review |

Mr. Reincke;

I do get quite the chuckle out of your vapid responses. At the very least you and Eric provide a respite from challenges of daily mental activity.

Jousting with you guys provides occasional fun, as it is easy fodder. I feel sorry for all of your shareholders who are innocently subjected to subpar performance by their management team, but both the tone and content of the e-mails that I receive from you and Eric lead me to believe that an adjustment to your medication regime is needed.

As graduates from the short bus transportation route I feel sure that most of what we say to you guys goes unabsorbed, but nevertheless we have tried our best to make an impression that quite obviously is well beyond your limited abilities to comprehend.

So be it. The more you write the more fun we have and the dumber you make yourselves look. Only complete idiots would antagonize those who are out there trying to raise you money, are your creditors as well as major shareholders. A unique management style, to be sure. We will see if it bears any additional fruit for you. Just FYI, I have a stack of NOBO lists from clients sitting next to my desk that is almost as high as your IQ. Obviously they felt that it was a "prudent" business decision to forward them, but I guess that none of them are quite as smart as you guys, eh? You are rewriting both history as well as the manual on standard business practice when trying to raise money. You quite obviously have something to hide, and we accept that as we filter it into our decision making processes.

Perhaps when this is all over with we will consider getting you guys enrolled in a Dale Carnegie course. This is better than the Comedy Channel.....as far as "prudent, reasonable decisions" are concerned, we await with breathless anticipation, your first one.

Mr. Furth

In a message dated 1/28/2008 7:17:19 P.M. Eastern Standard Time, richard@firstresponderproducts.com writes:

Mr. Furth:

I am in receipt of your recent emails and I continue to be appalled by your unprofessional and personal attacks. One of the first telephone conversations Eric Johnson and I had with you soon after you'd been paid by us (in cash and stock) ended with you screaming the foulest obscenities at Mr. Johnson. As I explained to your colleagues in the Group, I simply don't understand your level of personal hostility and vitriol. Your recent email arises because of a simple question about the need for a NOBO list to which you are not entitled and which bears no relevance to your job. If you cannot explain your need for such nonpublic information,

*67*

just say so.

The tenor of your email is extremely threatening and personally insulting. Our position is a clear, prudent, reasonable business decision. The "due diligence information" you requested is material nonpublic information which, as our agreement provides, is our decision to make concerning compliance. The decision is, that absent any reasonable or cogent (in fact, absent any) explanation as to why the information is needed, it cannot be disclosed.

As for the "money" that you "have been raising for us" in the markets recently, we have yet to see that money. Please send us a check or wire the funds.

**First Responder**

Richard Reincke | Chief Operating Officer/Chief Financial Officer

**First Responder Products, Inc.**
15455 N. Greenway-Hayden Loop #C4 | Scottsdale, AZ 85260
480.619.4747 tel. | 480.619.4740 fax | 602.677.9520 cell

**From:** J926@aol.com [mailto:J926@aol.com]
**Sent:** Monday, January 28, 2008 3:13 PM
**To:** eric@firstresponderproducts.com
**Cc:** richard@firstresponderproducts.com; tlg_communications@yahoo.com; compfsv@sbcglobal.net; attiasmi@yahoo.com
**Subject:** Re: For Review

Dear Eric,

In the face of potential financing, we are once disappointed but not surprised by your inaccurate, combative and self-serving response. It has been the hallmark of your conduct throughout our entire engagement. Really you do not need Consultants you need a proctologist, for you are well and truly a gigantic hemorrhoid. To engage you in any further debate over factual matters would be an unfair fight and we do not wish to make you look any worse than is already the case. You have made your position very clear and we understand it. The consequences of your decisions will be yours to live with. You are likely to soon be 0-for-2 in your public company stewardship.

Perhaps you could take a little of the money that we have been raising for you in the open markets recently and lay in a stout supply of Preparation-H to help reduce the incomprehensible swelling in your head.

Doug

**Richard Reincke**

From:     J926@aol.com

Sent:     Sunday, May 04, 2006 7:15 PM

To:       eric@firstresponderproducts.com

Cc:       richard@firstresponderproducts.com; tlg_communications@yahoo.com; compfsv@sbcglobal.net; attiasml@yahoo.com

Subject:  More of the Same

Dear Losers,

The luminescence of your malfeasance and personal as well as professional inadequacies continues to arc brightly against the backdrop of your now miniscule stock price, who's size is matched only by the application of intelligence that has been applied to the deal by incumbent management at all levels.

Two weeks ago you conned us yet again into thinking that you were actually making some material changes in the company and its management structure and style but actions speak far louder than words and you have continued to act in an entirely unresponsive and irresponsible manner to date.

You have now lost the term sheet from the bank and have also screwed your creditors as well as largest outside shareholders. How wonderful must it feel to be so proud of your accomplishments, eh? A 95% decline in your stock price, horrible operating margins, escalating losses and a chronic lack of money attributable to your own making all rolled into one. Clearly that is a legacy to be proud of. A two time loser in the making. There are not many around boasting that type of pedigree.

Insipid little peons acting like arrogant pricks. What a perfect joke you all are. In default on everything that you have done with us, and you blow us off without ceremony. I have seen used tampons with more manliness that the two of you possess and few others who have perfected the art of lying and deceitfulness to the level that you have achieved. Coupled with possible securities violations and a proficient talent for whining and revising history and you present a very impressive profile indeed.

Well, I suppose that you can look at the bright side of all this and take heart in the fact that at least you have found something that you both do well.

Very Sincerely,

Doug Furth

70

**Richard Reincke**

From:     J926@aol.com
Sent:     Tuesday, May 13, 2008 7:00 PM
To:       richard@firstresponderproducts.com
Cc:       compfsv@sbcglobal.net; attiasml@yahoo.com; eric@firstresponderproducts.com
Subject:  Re: your outrageous emails

Dear Hemorrhoid,

Gee, this makes everything alright then, just because you say so. You are a fraud and a cheat. You are quite correct when you quote the laws and they are quite clear regarding attempted fraud, which you have clearly committed. Rest assured that it will be reported as my taxes are filed.

The outrageous notion that your stock had the type of value that you stated on the form only goes to further demonstrate how firmly your heads are planted into your asses. If you think for one minute that ANYONE would accept such a valuation to be legitimate you are even dumber than I had thought, if that is even possible.

I am kind of glad that you are sticking to this position though. It is merely going to provide me yet another avenue to avenge the myriad of malfeasances that you ne'erdowells have wrought upon your shareholders.

You are truly a matching set of scumbags.


Sincerely,

Doug Furth

In a message dated 5/13/2008 8:53:24 P.M. Eastern Daylight Time, richard@firstresponderproducts.com writes:

Dear Mr. Furth:

As I informed you in previous email communications, the federal tax laws and regulations regarding the issuance of a Form 1099, and the values ascribed therein for equity compensation are well established  The Company fully complied with those legal requirements in issuing a Form 1099 to you.

In regard to that portion of your email communication dated May 12, 2008 which references the "falling" stock price, let me assure you that we have been and are in communication with the various relevant authorities concerning the recent activity in the trading of our common stock.  We can assure you, as a concerned control shareholder, that any improper or illegal activity will be prosecuted to the fullest extent of civil and criminal law.

Richard Reincke

71

**Richard Reincke**

From:      J926@aol.com
Sent:      Sunday, May 18, 2008 2:56 PM
To:        richard@firstresponderproducts.com
Cc:        eric@firstresponderproducts.com; compfsv@sbcglobal.net; attiasml@yahoo.com;
           mjbmd@adelphia.net; tlg_communications@yahoo.com
Subject:   Thinking of You

Dear Panty Wastes,

I was outside doing some gardening today when I saw a sceptic tank cleaning truck drive by and so I thought of you again. I just wanted to write and say hello to my favorite pair of panty waste scumbags.

I hope that I caught you before it is time for your medication today, so that you are lucid enough to at least read English. Not that I expect for you to be able to read or comprehend very much given your past track record of fantasy and malfeasance, but I needed some respite from the worms outside and so I thought that I would write to some worms out west.

The stock enjoyed yet another good week, with shareholder value soaring, almost reaching the point where the stock is down a little less than 93% since I met you. Another great week for the management team at First Responder. Perhaps you might want to consider a name change to Worst Responder? I think that this might be a little more appropriate and not nearly as misleading as your current name. What do you think?

We have all had a hearty laugh at your attempts to justify the validity of the 1099 and do applaud you if for nothing else than your collective imaginations for actually deluding yourselves into thinking that your ENITRELY ILLIQUID stock actually did have an intrinsic value approaching what you fraudulently stated. I wonder if the IRS and SEC will agree with your valuation of the stock and the loss carry forward that you have created for the company as a result. We shall see about this as time passes. It should prove to be interesting indeed.

And how does it feel to be deadbeats, defaulting on all of your agreements with us and with one of the lenders that we introduced to you? It must be very special indeed and yet another trophy for your mantles. How proud it must make you have acted so responsibly on behalf of your shareholders? Take heart in the notion that soon now you will be 0-for-2 in the managing of a public company. Or perhaps in your own world, maybe you think of it as being 2-for-2 in running companies into the ground? Tell me, just what IS the color of the moon in your world anyway? Does it rotate around you just like you think things do in this world?

We all here hope that you have a wonderful weekend and an even better week coming up. Shall we shoot for down 95% as a target?

Best of luck on that one.....I am betting that you can get there!

Sincerely,

Doug Furth

**Richard Reincke**

From:       J926@aol.com
Sent:       Monday, May 19, 2008 11:50 AM
To:         richard@firstresponderproducts.com
Cc:         eric@firstresponderproducts.com; attiasml@yahoo.com; tlg_communications@yahoo.com; mjbmd@adelphia.net; compfsv@sbcglobal.net
Subject:    CONGRATULATIONS!!!!!!!!!!!!!!

Dear Merry Morons,

Congratulations are in order. I just KNEW you could do it! The stock is now bidding at ONE PERCENT of what it was when I first met you guys!

As it turns out I am prophetic and you are just PATHETIC!!!!!

Sincerely,

Doug Furth

*73*

**Richard Reincke**

| | |
|---|---|
| **From:** | J926@aol.com |
| **Sent:** | Tuesday, May 20, 2008 12:21 PM |
| **To:** | richard@firstresponderproducts.com |
| **Cc:** | eric@firstresponderproducts.com; compfsv@sbcglobal.net; attiasml@yahoo.com; mjbmd@adelphia.net; tlg_communications@yahoo.com |

**Subject: A Rebound?**

Dear Peons,

Some food for thought:

**THINGS THAT ARE WORTH A PENNY**

Free Advice
Your Stock
A Politician's Promise
Your Word
Used Gum
Worst Responder Stock
A Toothpick
Your Stock
Britney Spear's Parenting Skills
Your Management Skills
Hillary Clinton's Chances for the Nomination
Your Chances for Success
Paris Hilton Staying Sober
You Showing a Profit
Chances of You Appearing on "Are You Smarter Than A Fifth Grader" TV Show
Chances of You Winning on it
Mick Jagger's Chances of Winning a Beauty Contest
A Good Looking 10-Q for FRPD
Anything Osama Says
Anything You Say

Have a Nice Day!

Sincerely,

Doug Furth

74

**Richard Reincke**

**From:**    J926@aol.com
**Sent:**    Wednesday, May 21, 2008 10:02 AM
**To:**      richard@firstresponderproducts.com
**Cc:**      eric@firstresponderproducts.com; compfsv@sbcglobal.net; attiasml@yahoo.com;
             tlg_communications@yahoo.com; mjbmd@adelphia.net
**Subject:** Purchase Order


Dear Pea Brains,

I have recently conducted some research and here is some food for thought:


**THINGS YOU CAN BUY WITH 100 SHARES OF FRPD STOCK**


Half a six-pack of Budweiser to help you try and forget why you bought FRPD at much higher prices
A six-pack of Charmin - Quilted! at Sam's Club
A Happy Meal at McDonalds; without a drink
A SMALL Latte at Starbuck's
One pair of Jockey Shorts; USED
Most of a burrito at Chipotles, but not the whole thing
Two bottles of 16.9 ounce Aquafina at the local Convenient Mart Store; without tax
A subway ride - one way
Two condoms to help you do to others what has been done to you by FPRD's "management team"
A small jar of Vaseline so that it won't hurt as much
Seven first class stamps; note that this is the only first class treatment that you will ever get from FPRD


**FUN FACTS ABOUT FRPD STOCK**

I recently tried to tip the valet who brought me my car with 100 shares of FRPD stock and he wouldn't take
it.....He said that he wanted a tip that was worth something!

Did you know that it would cost me THREE TIMES as much in commissions to sell 100 shares of FRPD stock
in commissions than it is worth?  And I use a discount brokerage firm!

The color of the FRPD stock certificates clashes with the other wallpaper in my house

The paper that the FRPD certificates are printed on is too rough to be comfortable as a substitute for Charmin,
although it is really an economical alternative.

If laminated the FRPD stock certificates make nice placements.

You need to turn the certificates backside up if you use them in birdcages, as it otherwise causes the birds to
begin screaming.  Perhaps they are shareholders in FPRD too?

The working title of Stephen King's new book is "Children of FRPD".

If your children should happen to swallow poison, just show them a FRPD stock certificate and it is SURE to
make them throw up!


Just thought you all might like to know these things.....

Sincerely,

Doug Furth

**Richard Reincke**

**From:**    J926@aol.com
**Sent:**    Monday, June 02, 2008 11:56 AM
**To:**      richard@firstresponderproducts.com
**Cc:**      eric@firstresponderproducts.com; compfsv@sbcglobal.net; tlg_communications@yahoo.com;
             mjbmd@adelphia.net; attiasml@yahoo.com
**Subject:** Two Cents!

Dear Pond Scum,

Congratulations on a new low today!  You have reached yet another milestone in your efforts to screw your
shareholders.  We saw your recent announcement about the "potential" reverse split.  How predictable, how
futile, how typical.  How scummy.....how normal.

**THINGS YOU CAN DO WITH TWO**

You can buy TWO "1's"!
You can run your SECOND public company into the ground!
You can screw your SECOND set of shareholders!
You can have a DUAL bankruptcy hearing!
You can lose TWICE as much money!
The TWO of you can screw each other like you have done to all of us!
I have TWO cheeks - one for each of you to kiss!
You can buy TWO shares of a stock that is selling for penny!
You can reverse split you stock TWICE as much and try to screw your shareholders TWICE as bad!
You can default on TWICE as many agreements!
You should feel TWICE as bad!
You can use TWO of your FRPD stock certificates to wipe your ass with!

So many more things to have fun with, but so little time to deal with phony liars and cheats like the TWO of you!

Sincerely,

Doug